# WILL *v.* MICHIGAN DEPARTMENT OF STATE POLICE ET AL.

## CERTIORARI TO THE SUPREME COURT OF MICHIGAN

No. 87–1207.   Argued December 5, 1988—Decided June 15, 1989

William Burnham argued the cause for petitioner. With him on the briefs were Clark Cunningham, Paul D. Reingold, John A. Powell, Helen Hershkoff, and Steven R. Shapiro.

George H. Weller, Assistant Attorney General of Michigan, argued the cause for respondents. With him on the brief were Frank J. Kelley, Attorney General, Louis J. Caruso, Solicitor General, and Thomas L. Casey, Assistant Solicitor General.*

---

*William A. Bradford, Jr., Conrad K. Harper, Stuart J. Land, Norman Redlich, William L. Robinson, and Antonia Hernandez filed a brief for the Lawyers' Committee for Civil Rights Under Law et al. as amici curiae urging reversal.

Briefs of amici curiae urging affirmance were filed for the State of Tennessee et al. by W. J. Michael Cody, Attorney General of Tennessee, and Michael W. Catalano, Deputy Attorney General, and by the Attorneys General for their respective jurisdictions as follows: Don Siegelman of Alabama, Robert K. Corbin of Arizona, John Steven Clark of Arkansas, John Van de Kamp of California, Duane Woodard of Colorado, Joseph Lieberman of Connecticut, Charles M. Oberly of Delaware, Robert Butterworth of Florida, Warren Pries III of Hawaii, Neil F. Hartigan of Illinois, Linley E. Pearson of Indiana, Thomas J. Miller of Iowa, Robert T. Stephan of Kansas, Frederic J. Cowan of Kentucky, William J. Guste, Jr., of Louisiana, J. Joseph Curran, Jr., of Maryland, Hubert H. Humphrey III of Minnesota, Michael C. Moore of Mississippi, William L. Webster of Missouri, Mike Greely of Montana, Robert M. Spire of Nebraska, Stephen E. Merrill of New Hampshire, Hal Stratton of New Mexico, Lacy H. Thornburg of North Carolina, Nicholas Spaeth of North Dakota, Anthony J. Celebrezze, Jr., of Ohio, Robert Henry of Oklahoma, LeRoy S. Zimmerman of Pennsylvania, Hector Rivera-Cruz of Puerto Rico, Travis Medlock of South

JUSTICE WHITE delivered the opinion of the Court.

This case presents the question whether a State, or an official of the State while acting in his or her official capacity, is a "person" within the meaning of Rev. Stat. § 1979, 42 U. S. C. § 1983.

Petitioner Ray Will filed suit in Michigan Circuit Court alleging various violations of the United States and Michigan Constitutions as grounds for a claim under § 1983.[1] He alleged that he had been denied a promotion to a data systems analyst position with the Department of State Police for an improper reason, that is, because his brother had been a student activist and the subject of a "red squad" file maintained by respondent. Named as defendants were the Department of State Police and the Director of State Police in his official capacity, also a respondent here.[2]

The Circuit Court remanded the case to the Michigan Civil Service Commission for a grievance hearing. While the grievance was pending, petitioner filed suit in the Michigan

---

Carolina, *Roger A. Tellinghuisen* of South Dakota, *David L. Wilkinson* of Utah, *Jeffrey Amestoy* of Vermont, *Mary Sue Terry* of Virginia, *Kenneth O. Eikenberry* of Washington, *Charlie Brown* of West Virginia, *Don J. Hanaway* of Wisconsin, and *Joseph B. Meyer* of Wyoming; and for the National Governors' Association et al. by *Benna Ruth Solomon, Kenneth S. Geller,* and *Andrew J. Pincus.*

[1] Section 1983 provides as follows:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia." 42 U. S. C. § 1983.

[2] Also named as defendants were the Michigan Department of Civil Service and the State Personnel Director, but those parties were subsequently dismissed by the state courts.

Court of Claims raising an essentially identical § 1983 claim. The Civil Service Commission ultimately found in petitioner's favor, ruling that respondents had refused to promote petitioner because of "partisan considerations." App. 46. On the basis of that finding, the state-court judge, acting in both the Circuit Court and the Court of Claims cases, concluded that petitioner had established a violation of the United States Constitution. The judge held that the Circuit Court action was barred under state law but that the Claims Court action could go forward. The judge also ruled that respondents were persons for purposes of § 1983.

The Michigan Court of Appeals vacated the judgment against the Department of State Police, holding that a State is not a person under § 1983, but remanded the case for determination of the possible immunity of the Director of State Police from liability for damages. The Michigan Supreme Court granted discretionary review and affirmed the Court of Appeals in part and reversed in part. *Smith* v. *Department of Pub. Health*, 428 Mich. 540, 410 N. W. 2d 749 (1987). The Supreme Court agreed that the State itself is not a person under § 1983, but held that a state official acting in his or her official capacity also is not such a person.

The Michigan Supreme Court's holding that a State is not a person under § 1983 conflicts with a number of state- and federal-court decisions to the contrary.[3] We granted certiorari to resolve the conflict. 485 U. S. 1005 (1988).

---

[3] The courts in the following cases have taken the position that a State is a person under § 1983. See *Della Grotta* v. *Rhode Island*, 781 F. 2d 343, 349 (CA1 1986); *Gay Student Services* v. *Texas A&M University*, 612 F. 2d 160, 163–164 (CA5), cert. denied, 449 U. S. 1034 (1980); *Uberoi* v. *University of Colorado*, 713 P. 2d 894, 900–901 (Colo. 1986); *Stanton* v. *Godfrey*, 415 N. E. 2d 103, 107 (Ind. App. 1981); *Gumbhir* v. *Kansas State Bd. of Pharmacy*, 231 Kan. 507, 512–513, 646 P. 2d 1078, 1084 (1982), cert. denied, 459 U. S. 1103 (1983); *Rahmah Navajo School Bd., Inc.* v. *Bureau of Revenue*, 104 N. M. 302, 310, 720 P. 2d 1243, 1251 (App.), cert. denied, 479 U. S. 940 (1986).

A larger number of courts have agreed with the Michigan Supreme Court that a State is not a person under § 1983. See *Ruiz* v. *Estelle*, 679

Prior to *Monell* v. *New York City Dept. of Social Services*, 436 U. S. 658 (1978), the question whether a State is a person within the meaning of § 1983 had been answered by this Court in the negative. In *Monroe* v. *Pape*, 365 U. S. 167, 187–191 (1961), the Court had held that a municipality was not a person under § 1983. "[T]hat being the case," we reasoned, § 1983 "could not have been intended to include States as parties defendant." *Fitzpatrick* v. *Bitzer*, 427 U. S. 445, 452 (1976).

But in *Monell*, the Court overruled *Monroe*, holding that a municipality was a person under § 1983. 436 U. S., at 690. Since then, various members of the Court have debated whether a State is a person within the meaning of § 1983, see *Hutto* v. *Finney*, 437 U. S. 678, 700–704 (1978) (BRENNAN, J., concurring); *id.*, at 708, n. 6 (Powell, J., concurring in

---

F. 2d 1115, 1137 (CA5), modified on other grounds, 688 F. 2d 266 (1982), cert. denied, 460 U. S. 1042 (1983); *Toledo, P. & W. R. Co.* v. *Illinois*, 744 F. 2d 1296, 1298–1299, and n. 1 (CA7 1984), cert. denied, 470 U. S. 1051 (1985); *Harris* v. *Missouri Court of Appeals*, 787 F. 2d 427, 429 (CA8), cert. denied, 479 U. S. 851 (1986); *Aubuchon* v. *Missouri*, 631 F. 2d 581, 582 (CA8 1980) *(per curiam)*, cert. denied, 450 U. S. 915 (1981); *State* v. *Green*, 633 P. 2d 1381, 1382 (Alaska 1981); *St. Mary's Hospital and Health Center* v. *State*, 150 Ariz. 8, 11, 721 P. 2d 666, 669 (App. 1986); *Mezey* v. *State*, 161 Cal. App. 3d 1060, 1065, 208 Cal. Rptr. 40, 43 (1984); *Hill* v. *Florida Dept. of Corrections*, 513 So. 2d 129, 132 (Fla. 1987), cert. denied, 484 U. S. 1064 (1988); *Merritt ex rel. Merritt* v. *State*, 108 Idaho 20, 26, 696 P. 2d 871, 877 (1985); *Woodbridge* v. *Worcester State Hospital*, 384 Mass. 38, 44–45, n. 7, 423 N. E. 2d 782, 786, n. 7 (1981); *Bird* v. *State Dept. of Public Safety*, 375 N. W. 2d 36, 43 (Minn. App. 1985); *Shaw* v. *St. Louis*, 664 S. W. 2d 572, 576 (Mo. App. 1983), cert. denied, 469 U. S. 849 (1984); *Fuchilla* v. *Layman*, 109 N. J. 319, 323–324, 537 A. 2d 652, 654, cert. denied, 488 U. S. 826 (1988); *Burkey* v. *Southern Ohio Correctional Facility*, 38 Ohio App. 3d 170, 170–171, 528 N. E. 2d 607, 608 (1988); *Gay* v. *State*, 730 S. W. 2d 154, 157–158 (Tex. App. 1987); *Edgar* v. *State*, 92 Wash. 2d 217, 221, 595 P. 2d 534, 537 (1979), cert. denied, 444 U. S. 1077 (1980); *Boldt* v. *State*, 101 Wis. 2d 566, 584, 305 N. W. 2d 133, 143–144, cert. denied, 454 U. S. 973 (1981).

part and dissenting in part), but this Court has never expressly dealt with that issue.[4]

Some courts, including the Michigan Supreme Court here, have construed our decision in *Quern* v. *Jordan*, 440 U. S. 332 (1979), as holding by implication that a State is not a person under § 1983. See *Smith* v. *Department of Pub. Health, supra*, at 581, 410 N. W. 2d, at 767. See also, *e. g., State* v. *Green*, 633 P. 2d 1381, 1382 (Alaska 1981); *Woodbridge* v. *Worcester State Hospital*, 384 Mass. 38, 44–45, n. 7, 423 N. E. 2d 782, 786, n. 7 (1981); *Edgar* v. *State*, 92 Wash. 2d 217, 221, 595 P. 2d 534, 537 (1979), cert. denied, 444 U. S. 1077 (1980). *Quern* held that § 1983 does not override a State's Eleventh Amendment immunity, a holding that the concurrence suggested was "patently dicta" to the effect that a State is not a person, 440 U. S., at 350 (BRENNAN, J., concurring in judgment).

Petitioner filed the present § 1983 actions in Michigan state court, which places the question whether a State is a person under § 1983 squarely before us since the Eleventh Amend-

---

[4] Petitioner cites a number of cases from this Court that he asserts have "assumed" that a State is a person. Those cases include ones in which a State has been sued by name under § 1983, see, *e. g., Maine* v. *Thiboutot*, 448 U. S. 1 (1980); *Martinez* v. *California*, 444 U. S. 277 (1980), various cases awarding attorney's fees against a State or a state agency, *Maine* v. *Thiboutot, supra; Hutto* v. *Finney*, 437 U. S. 678 (1978), and various cases discussing the waiver of Eleventh Amendment immunity by States, see, *e. g., Kentucky* v. *Graham*, 473 U. S. 159, 167, n. 14 (1985); *Edelman* v. *Jordan*, 415 U. S. 651 (1974). But the Court did not address the meaning of person in any of those cases, and in none of the cases was resolution of that issue necessary to the decision. Petitioner's argument evidently rests on the proposition that whether a State is a person under § 1983 is "jurisdictional" and "thus could have been raised by the Court on its own motion" in those cases. Brief for Petitioner 25, n. 15. Even assuming that petitioner's premise and characterization of the cases is correct, "this Court has never considered itself bound [by prior *sub silentio* holdings] when a subsequent case finally brings the jurisdictional issue before us." *Hagans* v. *Lavine*, 415 U. S. 528, 535, n. 5 (1974).

ment does not apply in state courts. *Maine* v. *Thiboutot*, 448 U. S. 1, 9, n. 7 (1980). For the reasons that follow, we reaffirm today what we had concluded prior to *Monell* and what some have considered implicit in *Quern:* that a State is not a person within the meaning of § 1983.

We observe initially that if a State is a "person" within the meaning of § 1983, the section is to be read as saying that "every person, including a State, who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects . . . ." That would be a decidedly awkward way of expressing an intent to subject the States to liability. At the very least, reading the statute in this way is not so clearly indicated that it provides reason to depart from the often-expressed understanding that "'in common usage, the term 'person' does not include the sovereign, [and] statutes employing the [word] are ordinarily construed to exclude it.'" *Wilson* v. *Omaha Tribe*, 442 U. S. 653, 667 (1979) (quoting *United States* v. *Cooper Corp.*, 312 U. S. 600, 604 (1941)). See also *United States* v. *Mine Workers*, 330 U. S. 258, 275 (1947).

This approach is particularly applicable where it is claimed that Congress has subjected the States to liability to which they had not been subject before. In *Wilson* v. *Omaha Tribe, supra,* we followed this rule in construing the phrase "white person" contained in 25 U. S. C. § 194, enacted as Act of June 30, 1834, 4 Stat. 729, as not including the "sovereign States of the Union." 442 U. S., at 667. This common usage of the term "person" provides a strong indication that "person" as used in § 1983 likewise does not include a State.[5]

---

[5] *Jefferson County Pharmaceutical Assn.* v. *Abbott Laboratories,* 460 U. S. 150 (1983), on which petitioner relies, is fully reconcilable with our holding in the present case. In *Jefferson County,* the Court held that States were persons that could be sued under the Robinson-Patman Act, 15 U. S. C. §§ 13(a) and 13(f). 460 U. S., at 155–157. But the plaintiff there was seeking only injunctive relief and not damages against the State

The language of § 1983 also falls far short of satisfying the ordinary rule of statutory construction that if Congress intends to alter the "usual constitutional balance between the States and the Federal Government," it must make its intention to do so "unmistakably clear in the language of the statute." *Atascadero State Hospital* v. *Scanlon*, 473 U. S. 234, 242 (1985); see also *Pennhurst State School and Hospital* v. *Halderman*, 465 U. S. 89, 99 (1984). *Atascadero* was an Eleventh Amendment case, but a similar approach is applied in other contexts. Congress should make its intention "clear and manifest" if it intends to pre-empt the historic powers of the States, *Rice* v. *Santa Fe Elevator Corp.*, 331 U. S. 218, 230 (1947), or if it intends to impose a condition on the grant of federal moneys, *Pennhurst State School and Hospital* v. *Halderman*, 451 U. S. 1, 16 (1981); *South Dakota* v. *Dole*, 483 U. S. 203, 207 (1987). "In traditionally sensitive areas, such as legislation affecting the federal balance, the requirement of clear statement assures that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision." *United States* v. *Bass*, 404 U. S. 336, 349 (1971).

Our conclusion that a State is not a "person" within the meaning of § 1983 is reinforced by Congress' purpose in en-

---

defendant, the Board of Trustees of the University of Alabama; the District Court had dismissed the plaintiff's damages claim as barred by the Eleventh Amendment. *Id.*, at 153, n. 5. Had the present § 1983 action been brought in federal court, a similar disposition would have resulted. Of course, the Court would never be faced with a case such as *Jefferson County* that had been brought in a state court because the federal courts have exclusive jurisdiction over claims under the federal antitrust laws. 15 U. S. C. §§ 15 and 26. Moreover, the Court in *Jefferson County* was careful to limit its holding to "state purchases for the purpose of competing against private enterprise . . . in the retail market." 460 U. S., at 154. It assumed without deciding "that Congress did not intend the Act to apply to state purchases for consumption in traditional governmental functions," *ibid.*, which presents a more difficult question because it may well "affec[t] the federal balance." See *United States* v. *Bass*, 404 U. S. 336, 349 (1971).

acting the statute. Congress enacted § 1 of the Civil Rights Act of 1871, 17 Stat. 13, the precursor to § 1983, shortly after the end of the Civil War "in response to the widespread deprivations of civil rights in the Southern States and the inability or unwillingness of authorities in those States to protect those rights or punish wrongdoers." *Felder* v. *Casey*, 487 U. S. 131, 147 (1988). Although Congress did not establish federal courts as the exclusive forum to remedy these deprivations, *ibid.*, it is plain that "Congress assigned to the federal courts a paramount role" in this endeavor, *Patsy* v. *Board of Regents of Florida*, 457 U. S. 496, 503 (1982).

Section 1983 provides a federal forum to remedy many deprivations of civil liberties, but it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties. The Eleventh Amendment bars such suits unless the State has waived its immunity, *Welch* v. *Texas Dept. of Highways and Public Transportation*, 483 U. S. 468, 472–473 (1987) (plurality opinion), or unless Congress has exercised its undoubted power under § 5 of the Fourteenth Amendment to override that immunity. That Congress, in passing § 1983, had no intention to disturb the States' Eleventh Amendment immunity and so to alter the federal-state balance in that respect was made clear in our decision in *Quern*. Given that a principal purpose behind the enactment of § 1983 was to provide a federal forum for civil rights claims, and that Congress did not provide such a federal forum for civil rights claims against States, we cannot accept petitioner's argument that Congress intended nevertheless to create a cause of action against States to be brought in state courts, which are precisely the courts Congress sought to allow civil rights claimants to avoid through § 1983.

This does not mean, as petitioner suggests, that we think that the scope of the Eleventh Amendment and the scope of § 1983 are not separate issues. Certainly they are. But in deciphering congressional intent as to the scope of § 1983, the

scope of the Eleventh Amendment is a consideration, and we decline to adopt a reading of § 1983 that disregards it.[6]

Our conclusion is further supported by our holdings that in enacting § 1983, Congress did not intend to override well-established immunities or defenses under the common law. "One important assumption underlying the Court's decisions in this area is that members of the 42d Congress were familiar with common-law principles, including defenses previously recognized in ordinary tort litigation, and that they likely intended these common-law principles to obtain, absent specific provisions to the contrary." *Newport* v. *Fact Concerts, Inc.*, 453 U. S. 247, 258 (1981). *Stump* v. *Sparkman*, 435 U. S. 349, 356 (1978); *Scheuer* v. *Rhodes*, 416 U. S. 232, 247 (1974); *Pierson* v. *Ray*, 386 U. S. 547, 554 (1967); and *Tenney* v. *Brandhove*, 341 U. S. 367, 376 (1951), are also to this effect. The doctrine of sovereign immunity was a familiar doctrine at common law. "The principle is elementary that a State cannot be sued in its own courts without its consent." *Railroad Co.* v. *Tennessee*, 101 U. S. 337, 339 (1880). It is an "established principle of jurisprudence" that the sovereign cannot be sued in its own courts without its consent. *Beers* v. *Arkansas*, 20 How. 527, 529 (1858). We cannot conclude that § 1983 was intended to disregard the well-established immunity of a State from being sued without its consent.[7]

---

[6] Petitioner argues that Congress would not have considered the Eleventh Amendment in enacting § 1983 because in 1871 this Court had not yet held that the Eleventh Amendment barred federal-question cases against States in federal court. This argument is no more than an attempt to have this Court reconsider *Quern* v. *Jordan*, 440 U. S. 332 (1979), which we decline to do.

[7] Our recognition in *Monell* v. *New York City Dept. of Social Services*, 436 U. S. 658 (1978), that a municipality is a person under § 1983, is fully consistent with this reasoning. In *Owen* v. *City of Independence*, 445 U. S. 622 (1980), we noted that by the time of the enactment of § 1983, municipalities no longer retained the sovereign immunity they had previously shared with the States. "[B]y the end of the 19th century, courts

The legislative history of § 1983 does not suggest a different conclusion. Petitioner contends that the congressional debates on § 1 of the 1871 Act indicate that § 1983 was intended to extend to the full reach of the Fourteenth Amendment and thereby to provide a remedy "'against all forms of official violation of federally protected rights.'" Brief for Petitioner 16 (quoting *Monell*, 436 U. S., at 700–701). He refers us to various parts of the vigorous debates accompanying the passage of § 1983 and revealing that it was the failure of the States to take appropriate action that was undoubtedly the motivating force behind § 1983. The inference must be drawn, it is urged, that Congress must have intended to subject the States themselves to liability. But the intent of Congress to provide a remedy for unconstitutional state action does not without more include the sovereign States among those persons against whom § 1983 actions would lie. Construing § 1983 as a remedy for "official violation of federally protected rights" does no more than confirm that the section is directed against state action—action "under color of" state law. It does not suggest that the State itself was a person that Congress intended to be subject to liability.

Although there were sharp and heated debates, the discussion of § 1 of the bill, which contained the present § 1983, was not extended. And although in other respects the impact on state sovereignty was much talked about, no one suggested that § 1 would subject the States themselves to a damages suit under federal law. *Quern*, 440 U. S., at 343. There was complaint that § 1 would subject state officers to damages liability, but no suggestion that it would also expose the States themselves. Cong. Globe, 42d Cong., 1st Sess.,

___

regularly held that in imposing a specific duty on the municipality either in its charter or by statute, the State had impliedly withdrawn the city's immunity from liability for the nonperformance or misperformance of its obligation," *id.*, at 646, and, as a result, municipalities had been held liable for damages "in a multitude of cases" involving previously immune activities, *id.*, at 646–647.

366, 385 (1871). We find nothing substantial in the legislative history that leads us to believe that Congress intended that the word "person" in § 1983 included the States of the Union. And surely nothing in the debates rises to the clearly expressed legislative intent necessary to permit that construction.

Likewise, the Act of Feb. 25, 1871, § 2, 16 Stat. 431 (the "Dictionary Act"),[8] on which we relied in *Monell, supra,* at 688–689, does not counsel a contrary conclusion here. As we noted in *Quern,* that Act, while adopted prior to § 1 of the Civil Rights Act of 1871, was adopted after § 2 of the Civil Rights Act of 1866, from which § 1 of the 1871 Act was derived. 440 U. S., at 341, n. 11. Moreover, we disagree with JUSTICE BRENNAN that at the time the Dictionary Act was passed "the phrase 'bodies politic and corporate' was understood to include the States." *Post,* at 78. Rather, an examination of authorities of the era suggests that the phrase was used to mean corporations, both private and public (municipal), and not to include the States.[9] In our view, the

---

[8] The Dictionary Act provided that

"in all acts hereafter passed . . . the word 'person' may extend and be applied to bodies politic and corporate . . . unless the context shows that such words were intended to be used in a more limited sense." Act of Feb. 25, 1871, § 2, 16 Stat. 431.

[9] See *United States* v. *Fox,* 94 U. S. 315, 321 (1877); 1 B. Abbott, Dictionary of Terms and Phrases Used in American or English Jurisprudence 155 (1879) ("most exact expression" for "public corporation"); W. Anderson, A Dictionary of Law 127 (1893) ("most exact expression for a public corporation or corporation having powers of government"); Black's Law Dictionary 143 (1891) ("body politic" is "term applied to a corporation, which is usually designated as a 'body corporate and politic'" and "is particularly appropriate to a *public* corporation invested with powers and duties of government"); 1 A. Burrill, A Law Dictionary and Glossary 212 (2d ed. 1871) ("body politic" is "term applied to a corporation, which is usually designated as a *body corporate and politic*"). A public corporation, in ordinary usage, was another term for a municipal corporation, and included towns, cities, and counties, but not States. See 2 Abbott, *supra,*

Dictionary Act, like § 1983 itself and its legislative history, fails to evidence a clear congressional intent that States be held liable.

Finally, *Monell* itself is not to the contrary. True, prior to *Monell* the Court had reasoned that if municipalities were not persons then surely States also were not. *Fitzpatrick* v. *Bitzer*, 427 U. S., at 452. And *Monell* overruled *Monroe*, undercutting that logic. But it does not follow that if municipalities are persons then so are States. States are protected by the Eleventh Amendment while municipalities are not, *Monell*, 436 U. S., at 690, n. 54, and we consequently limited our holding in *Monell* "to local government units which are not considered part of the State for Eleventh Amendment purposes," *ibid.* Conversely, our holding here does not cast any doubt on *Monell*, and applies only to States or governmental entities that are considered "arms of the State" for Eleventh Amendment purposes. See, *e. g.*, *Mt. Healthy Bd. of Ed.* v. *Doyle*, 429 U. S. 274, 280 (1977).

Petitioner asserts, alternatively, that state officials should be considered "persons" under § 1983 even though acting in their official capacities. In this case, petitioner named as defendant not only the Michigan Department of State Police but also the Director of State Police in his official capacity.

---

at 347; Anderson, *supra*, at 264–265; Black, *supra*, at 278; 2 Burrill, *supra*, at 352.

JUSTICE BRENNAN appears to confuse this precise definition of the phrase with its use "in a rather loose way," see Black, *supra*, at 143, to refer to *the* state (as opposed to *a* State). This confusion is revealed most clearly in JUSTICE BRENNAN's reliance on the 1979 edition of Black's Law Dictionary, which defines "body politic or corporate" as "[a] social compact by which the whole people covenants with each citizen, and each citizen with the whole people, that all shall be governed by certain laws for the common good." *Post*, at 79. To the extent JUSTICE BRENNAN's citation of other authorities does not suffer from the same confusion, those authorities at best suggest that the phrase is ambiguous, which still renders the Dictionary Act incapable of supplying the necessary clear intent.

Obviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. *Brandon* v. *Holt*, 469 U. S. 464, 471 (1985). As such, it is no different from a suit against the State itself. See, *e. g.*, *Kentucky* v. *Graham*, 473 U. S. 159, 165–166 (1985); *Monell, supra*, at 690, n. 55. We see no reason to adopt a different rule in the present context, particularly when such a rule would allow petitioner to circumvent congressional intent by a mere pleading device.[10]

We hold that neither a State nor its officials acting in their official capacities are "persons" under § 1983. The judgment of the Michigan Supreme Court is affirmed.

*It is so ordered.*

JUSTICE BRENNAN, with whom JUSTICE MARSHALL, JUSTICE BLACKMUN, and JUSTICE STEVENS join, dissenting.

Because this case was brought in state court, the Court concedes, the Eleventh Amendment is inapplicable here. See *ante*, at 63–64. Like the guest who would not leave,

---

[10] Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because "official-capacity actions for prospective relief are not treated as actions against the State." *Kentucky* v. *Graham*, 473 U. S., at 167, n. 14; *Ex parte Young*, 209 U. S. 123, 159–160 (1908). This distinction is "commonplace in sovereign immunity doctrine," L. Tribe, American Constitutional Law § 3–27, p. 190, n. 3 (2d ed. 1988), and would not have been foreign to the 19th-century Congress that enacted § 1983, see, *e. g.*, *In re Ayers*, 123 U. S. 443, 506–507 (1887); *United States* v. *Lee*, 106 U. S. 196, 219–222 (1882); *Board of Liquidation* v. *McComb*, 92 U. S. 531, 541 (1876); *Osborn* v. *Bank of United States*, 9 Wheat. 738 (1824). *City of Kenosha* v. *Bruno*, 412 U. S. 507, 513 (1973), on which JUSTICE STEVENS relies, see *post*, at 93, n. 8, is not to the contrary. That case involved municipal liability under § 1983, and the fact that nothing in § 1983 suggests its "bifurcated application to municipal corporations depending on the nature of the relief sought against them," 412 U. S., at 513, is not surprising, since by the time of the enactment of § 1983 municipalities were no longer protected by sovereign immunity. *Supra*, at 67–68, n. 7.

however, the Eleventh Amendment lurks everywhere in today's decision and, in truth, determines its outcome.

## I

Section 1 of the Civil Rights Act of 1871, 42 U. S. C. § 1983, renders certain "persons" liable for deprivations of constitutional rights. The question presented is whether the word "person" in this statute includes the States and state officials acting in their official capacities.

One might expect that this statutory question would generate a careful and thorough analysis of the language, legislative history, and general background of § 1983. If this is what one expects, however, one will be disappointed by today's decision. For this case is not decided on the basis of our ordinary method of statutory construction; instead, the Court disposes of it by means of various rules of statutory interpretation that it summons to its aid each time the question looks close. Specifically, the Court invokes the following interpretative principles: the word "persons" is ordinarily construed to exclude the sovereign; congressional intent to affect the federal-state balance must be "clear and manifest"; and intent to abrogate States' Eleventh Amendment immunity must appear in the language of the statute itself. The Court apparently believes that each of these rules obviates the need for close analysis of a statute's language and history. Properly applied, however, only the last of these interpretative principles has this effect, and that principle is not pertinent to the case before us.

The Court invokes, first, the "often-expressed understanding" that "'in common usage, the term "person" does not include the sovereign, [and] statutes employing the [word] are ordinarily construed to exclude it.'" *Ante*, at 64, quoting *Wilson* v. *Omaha Tribe*, 442 U. S. 653, 667 (1979). This rule is used both to refute the argument that the language of § 1983 demonstrates an intent that States be included as defendants, *ante*, at 64, and to overcome the argu-

ment based on the Dictionary Act's definition of "person" to include bodies politic and corporate, *ante,* at 69–70. It is ironic, to say the least, that the Court chooses this interpretive rule in explaining why the Dictionary Act is not decisive, since the rule is relevant only when the word "persons" has no statutory definition. When one considers the origins and content of this interpretive guideline, moreover, one realizes that it is inapplicable here and, even if applied, would defeat rather than support the Court's approach and result.

The idea that the word "persons" ordinarily excludes the sovereign can be traced to the "familiar principle that the King is not bound by any act of Parliament unless he be named therein by special and particular words." *Dollar Savings Bank* v. *United States,* 19 Wall. 227, 239 (1874). As this passage suggests, however, this interpretive principle applies only to "the enacting sovereign." *United States* v. *California,* 297 U. S. 175, 186 (1936). See also *Jefferson County Pharmaceutical Assn., Inc.* v. *Abbott Laboratories,* 460 U. S. 150, 161, n. 21 (1983). Furthermore, as explained in *United States* v. *Herron,* 20 Wall. 251, 255 (1874), even the principle as applied to the enacting sovereign is not without limitations: "Where an act of Parliament is made for the public good, as for the advancement of religion and justice or to prevent injury and wrong, the king is bound by such act, though not particularly named therein; but where a statute is general, and thereby any prerogative, right, title, or interest is divested or taken from the king, in such case the king is not bound, unless the statute is made to extend to him by express words." It would be difficult to imagine a statute more clearly designed "for the public good," and "to prevent injury and wrong," than § 1983.

Even if this interpretive principle were relevant to this case, the Court's invocation of it to the exclusion of careful statutory analysis is in error. As we have made clear, this principle is merely "an aid to consistent construction of statutes of the enacting sovereign when their purpose is in

doubt, but it does not require that the aim of a statute fairly to be inferred be disregarded because not explicitly stated." *United States* v. *California, supra,* at 186. Indeed, immediately following the passage quoted by the Court today, *ante,* at 64, to the effect that statutes using the word "person" are "ordinarily construed to exclude" the sovereign, we stated:

> "But there is no hard and fast rule of exclusion. The purpose, the subject matter, the context, the legislative history, and the executive interpretation of the statute are aids to construction which may indicate an intent, by the use of the term, to bring state or nation within the scope of the law.
>
> .    .    .    .    .
>
> "Decision is not to be reached by a strict construction of the words of the Act, nor by the application of artificial canons of construction. On the contrary, we are to read the statutory language in its ordinary and natural sense, and if doubts remain, resolve them in the light, not only of the policy intended to be served by the enactment, but, as well, by all other available aids to construction." *United States* v. *Cooper Corp.,* 312 U. S. 600, 604–605 (1941).

See also *Wilson* v. *Omaha Indian Tribe, supra,* at 667 ("There is . . . 'no hard and fast rule of exclusion,' *United States* v. *Cooper Corp.,* [312 U. S. 600,] 604–605 [(1941)]; and much depends on the context, the subject matter, legislative history, and executive interpretation"); *Pfizer Inc.* v. *India,* 434 U. S. 308, 315–318 (1978); *Guarantee Title & Trust Co.* v. *Title Guaranty & Surety Co.,* 224 U. S. 152, 155 (1912); *Lewis* v. *United States,* 92 U. S. 618, 622 (1875); *Green* v. *United States,* 9 Wall. 655, 658 (1870).

The second interpretive principle that the Court invokes comes from cases such as *Rice* v. *Santa Fe Elevator Corp.,* 331 U. S. 218, 230 (1947); *Pennhurst State School and Hospital* v. *Halderman,* 451 U. S. 1, 16 (1981); *South Dakota* v. *Dole,* 483 U. S. 203, 207–208 (1987); and *United States* v.

*Bass*, 404 U. S. 336, 349 (1971), which require a "clear and manifest" expression of congressional intent to change some aspect of federal-state relations. *Ante*, at 65. These cases do not, however, permit substitution of an absolutist rule of statutory construction for thorough statutory analysis. Indeed, in each of these decisions the Court undertook a careful and detailed analysis of the statutory language and history under consideration. *Rice* is a particularly inapposite source for the interpretive method that the Court today employs, since it observes that, according to conventional pre-emption analysis, a "clear and manifest" intent to pre-empt state legislation may appear in the "scheme" or "purpose" of the federal statute. See 331 U. S., at 230.

The only principle of statutory construction employed by the Court that would justify a perfunctory and inconclusive analysis of a statute's language and history is one that is irrelevant to this case. This is the notion "that if Congress intends to alter the 'usual constitutional balance between the States and the Federal Government,' it must make its intention to do so 'unmistakably clear in the language of the statute.'" *Ante*, at 65, quoting *Atascadero State Hospital* v. *Scanlon*, 473 U. S. 234, 242 (1985). As the Court notes, *Atascadero* was an Eleventh Amendment case; the "constitutional balance" to which *Atascadero* refers is that struck by the Eleventh Amendment as this Court has come to interpret it. Although the Court apparently wishes it were otherwise, the principle of interpretation that *Atascadero* announced is unique to cases involving the Eleventh Amendment.

Where the Eleventh Amendment applies, the Court has devised a clear-statement principle more robust than its requirement of clarity in any other situation. Indeed, just today, the Court has intimated that this clear-statement principle is not simply a means of discerning congressional intent. See *Dellmuth* v. *Muth, post,* at 232 (concluding that one may not rely on a "permissible inference" from a statute's language and structure in finding abrogation of immunity); *post,*

at 238–239 (BRENNAN, J., dissenting); but see *Pennsylvania* v. *Union Gas Co.*, *ante*, p. 1. Since this case was brought in state court, however, this strict drafting requirement has no application here. The Eleventh Amendment can hardly be "a consideration," *ante*, at 67, in a suit to which it does not apply.

That this Court has generated a uniquely daunting requirement of clarity in Eleventh Amendment cases explains why *Quern* v. *Jordan*, 440 U. S. 332 (1979), did not decide the question before us today. Because only the Eleventh Amendment permits use of this clear-statement principle, the holding of *Quern* v. *Jordan* that § 1983 does not abrogate States' Eleventh Amendment immunity tells us nothing about the meaning of the term "person" in § 1983 as a matter of ordinary statutory construction. *Quern*'s conclusion thus does not compel, or even suggest, a particular result today.

The singularity of this Court's approach to statutory interpretation in Eleventh Amendment cases also refutes the Court's argument that, given *Quern*'s holding, it would make no sense to construe § 1983 to include States as "persons." See *ante*, at 66. This is so, the Court suggests, because such a construction would permit suits against States in state but not federal court, even though a major purpose of Congress in enacting § 1983 was to provide a federal forum for litigants who had been deprived of their constitutional rights. See, *e. g.*, *Monroe* v. *Pape*, 365 U. S. 167 (1961). In answering the question whether § 1983 provides a federal forum for suits against the States themselves, however, one must apply the clear-statement principle reserved for Eleventh Amendment cases. Since this principle is inapplicable to suits brought in state court, and inapplicable to the question whether States are among those subject to a statute, see *Employees* v. *Missouri Dept. of Public Health and Welfare*, 411 U. S. 279, 287 (1973); *Atascadero, supra*, at 240, n. 2, the answer to the question whether § 1983 provides a federal forum for suits against the States may be, and most often will

be, different from the answer to the kind of question before us today. Since the question whether Congress has provided a federal forum for damages suits against the States is answered by applying a uniquely strict interpretive principle, see *supra*, at 75, the Court should not pretend that we have, in *Quern*, answered the question whether Congress intended to provide a federal forum for such suits, and then reason backwards from that "intent" to the conclusion that Congress must not have intended to allow such suits to proceed in state court.

In short, the only principle of statutory interpretation that permits the Court to avoid a careful and thorough analysis of § 1983's language and history is the clear-statement principle that this Court has come to apply in Eleventh Amendment cases — a principle that is irrelevant to this state-court action. In my view, a careful and detailed analysis of § 1983 leads to the conclusion that States are "persons" within the meaning of that statute.

## II

Section 1983 provides:

> "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

Although § 1983 itself does not define the term "person," we are not without a statutory definition of this word. "Any analysis of the meaning of the word 'person' in § 1983 . . . must begin . . . with the Dictionary Act." *Monell* v. *New York City Dept. of Social Services*, 436 U. S. 658, 719 (1978) (REHNQUIST, J., dissenting). Passed just two months be-

fore § 1983, and designed to "suppl[y] rules of construction for all legislation," *ibid.*, the Dictionary Act provided:

> "That in all acts hereafter passed . . . the word 'person' may extend and be applied to bodies politic and corporate . . . unless the context shows that such words were intended to be used in a more limited sense . . . ." Act of Feb. 25, 1871, § 2, 16 Stat. 431.

In *Monell*, we held this definition to be not merely allowable but mandatory, requiring that the word "person" be construed to include "bodies politic and corporate" unless the statute under consideration "by its terms called for a deviation from this practice." 436 U. S., at 689–690, n. 53. Thus, we concluded, where nothing in the "context" of a particular statute "call[s] for a restricted interpretation of the word 'person,' the language of that [statute] should prima facie be construed to include 'bodies politic' among the entities that could be sued." *Ibid.*

Both before and after the time when the Dictionary Act and § 1983 were passed, the phrase "bodies politic and corporate" was understood to include the States. See, *e. g.*, J. Bouvier, 1 A Law Dictionary Adapted to the Constitution and Laws of the United States of America 185 (11th ed. 1866); W. Shumaker & G. Longsdorf, Cyclopedic Dictionary of Law 104 (1901); *Chisholm* v. *Georgia*, 2 Dall. 419, 447 (1793) (Iredell, J.); *id.*, at 468 (Cushing, J.); *Cotton* v. *United States*, 11 How. 229, 231 (1851) ("Every sovereign State is of necessity a body politic, or artificial person"); *Poindexter* v. *Greenhow*, 114 U. S. 270, 288 (1885); *McPherson* v. *Blacker*, 146 U. S. 1, 24 (1892); *Heim* v. *McCall*, 239 U. S. 175, 188 (1915). See also *United States* v. *Maurice*, 2 Brock. 96, 109 (CC Va. 1823) (Marshall, C. J.) ("The United States is a government, and, consequently, a body politic and corporate"); *Van Brocklin* v. *Tennessee*, 117 U. S. 151, 154 (1886) (same). Indeed, the very legislators who passed § 1 referred to States in these terms. See, *e. g.*, Cong. Globe, 42d Cong., 1st Sess., 661–662 (1871) (Sen. Vickers) ("What is a State? Is

it not a body politic and corporate?"); *id.*, at 696 (Sen. Edmunds) ("A State is a corporation").

The reason why States are "bodies politic and corporate" is simple: just as a corporation is an entity that can act only through its agents, "[t]he State is a political corporate body, can act only through agents, and can command only by laws." *Poindexter* v. *Greenhow, supra,* at 288. See also Black's Law Dictionary 159 (5th ed. 1979) ("[B]ody politic or corporate": "A social compact by which the whole people covenants with each citizen, and each citizen with the whole people, that all shall be governed by certain laws for the common good"). As a "body politic and corporate," a State falls squarely within the Dictionary Act's definition of a "person."

While it is certainly true that the phrase "bodies politic and corporate" referred to private and public corporations, see *ante,* at 69, and n. 9, this fact does not draw into question the conclusion that this phrase also applied to the States. Phrases may, of course, have multiple referents. Indeed, each and every dictionary cited by the Court accords a broader realm—one that comfortably, and in most cases explicitly, includes the sovereign—to this phrase than the Court gives it today. See 1 B. Abbott, Dictionary of Terms and Phrases Used in American or English Jurisprudence 155 (1879) ("[T]he term body politic is often used in a general way, as meaning the state or the sovereign power, or the city government, without implying any distinct express incorporation"); W. Anderson, A Dictionary of Law 127 (1893) ("[B]ody politic": "The governmental, sovereign power: a city or a State"); Black's Law Dictionary 143 (1891) ("[B]ody politic": "It is often used, in a rather loose way, to designate the state or nation or sovereign power, or the government of a county or municipality, without distinctly connoting any express and individual corporate charter"); 1 A. Burrill, A Law Dictionary and Glossary 212 (2d ed. 1871) ("[B]ody politic": "A body to take in succession, framed by *policy*"; "[p]articu-

larly applied, in the old books, to a corporation sole"); *id.*, at 383 ("[C]orporation sole" includes the sovereign in England).

Because I recognize that both uses of this phrase were deemed valid when § 1983 and the Dictionary Act were passed, the Court accuses me of "confus[ing] [the] precise definition of [this] phrase with its use 'in a rather loose way,'" "to refer to *the* state (as opposed to *a* State)." *Ante*, at 70, n. 9, quoting Black, *supra*, at 143. It had never occurred to me, however, that only "precise" definitions counted as valid ones. Where the question we face is what meaning Congress attached to a particular word or phrase, we usually—and properly—are loath to conclude that Congress meant to use the word or phrase in a hypertechnical sense unless it said so. Nor does the Court's distinction between "*the* state" and "*a* State" have any force. The suggestion, I take it, is that the phrase "bodies politic and corporate" refers only to nations rather than to the states within a nation; but then the Court must explain why so many of the sources I have quoted refer to states *in addition to* nations. In an opinion so utterly devoted to the rights of the States as sovereigns, moreover, it is surprising indeed to find the Court distinguishing between our sovereign States and our sovereign Nation.

In deciding what the phrase "bodies politic and corporate" means, furthermore, I do not see the relevance of the meaning of the term "public corporation." See *ante*, at 69–70, n. 9. That is not the phrase chosen by Congress in the Dictionary Act, and the Court's suggestion that this phrase is coterminous with the phrase "bodies politic and corporate" begs the question whether the latter one includes the States. Nor do I grasp the significance of this Court's decision in *United States* v. *Fox*, 94 U. S. 315 (1877), in which the question was whether the State of New York, by including "persons" and "corporations" within the class of those to whom land could be devised, had intended to authorize devises to the United States. *Ante*, at 69–70, n. 9. Noting that "[t]he question is to be determined by the laws of [New York]," the

Court held that it would require "an express definition" to hold that the word "persons" included the Federal Government, and that under state law the term "corporations" applied only to corporations created under the laws of New York. 94 U. S., at 320–321. The pertinence of these state-law questions to the issue before us today escapes me. Not only do we confront an entirely different, *federal* statute, but we also have an express statement, in the Dictionary Act, that the word "person" in § 1 includes "bodies politic and corporate." See also *Pfizer Inc.* v. *India*, 434 U. S., at 315, n. 15.

The relevance of the fact that § 2 of the Civil Rights Act of 1866, 14 Stat. 27, — the model for § 1 of the 1871 Act — was passed before the Dictionary Act, see *ante*, at 69, similarly eludes me. Congress chose to use the word "person" in the 1871 Act even after it had passed the Dictionary Act, presumptively including "bodies politic and corporate" within the category of "persons." Its decision to do so — and its failure to indicate in the 1871 Act that the Dictionary Act's presumption was not to apply — demonstrate that Congress did indeed intend "persons" to include bodies politic and corporate. In addition, the Dictionary Act's definition of "person" by no means dropped from the sky. Many of the authorities cited above predate both the Dictionary Act *and* the 1866 Act, indicating that the word "persons" in 1866 ordinarily would have been thought to include "bodies politic and corporate," with or without the Dictionary Act.

This last point helps to explain why it is a matter of small importance that the Dictionary Act's definition of "person" as including bodies politic and corporate was retroactively withdrawn when the federal statutes were revised in 1874. See T. Durant, Report to Joint Committee on Revision of Laws 2 (1873). Only two months after presumptively designating bodies politic and corporate as "persons," Congress chose the word "person" for § 1 of the Civil Rights Act. For the purpose of determining Congress' intent in using this

term, it cannot be decisive that, three years later, it withdrew this presumption. In fact, both the majority and dissent in *Monell* emphasized the 1871 version of the Dictionary Act, but neither saw fit even to mention the 1874 revision of this statute. 436 U. S., at 688–689, and nn. 51, 53 (opinion for the Court); *id.*, at 719 (REHNQUIST, J., dissenting). Even in cases, moreover, where no statutory definition of the word "persons" is available, we have not hesitated to include bodies politic and corporate within that category. See *Stanley* v. *Schwalby*, 147 U. S. 508, 517 (1893) ("[T]he word 'person' in the statute would include [the States] as a body politic and corporate"); *Ohio* v. *Helvering*, 292 U. S. 360, 370 (1934); *United States* v. *Shirey*, 359 U. S. 255, 257, n. 2 (1959).

Thus, the question before us is whether the presumption that the word "person" in § 1 of the Civil Rights Act of 1871 included bodies politic and corporate—and hence the States—is overcome by anything in the statute's language and history. Certainly nothing in the statutory language overrides this presumption. The statute is explicitly directed at action taken "under color of" state law, and thus supports rather than refutes the idea that the "persons" mentioned in the statute include the States. Indeed, for almost a century—until *Monroe* v. *Pape*, 365 U. S. 167 (1961)—it was unclear whether the statute applied at all to action not authorized by the State, and the enduring significance of the first cases construing the Fourteenth Amendment, pursuant to which § 1 was passed, lies in their conclusion that the prohibitions of this Amendment do not reach private action. See *Civil Rights Cases*, 109 U. S. 3 (1883). In such a setting, one cannot reasonably deny the significance of § 1983's explicit focus on state action.

Unimpressed by such arguments, the Court simply asserts that reading "States" where the statute mentions "person" would be "decidedly awkward." *Ante*, at 64. The Court does not describe the awkwardness that it perceives, but I take it that its objection is that the under-color-of-law

requirement would be redundant if States were included in the statute because States necessarily act under color of state law. But § 1983 extends as well to natural persons, who do not necessarily so act; in order to ensure that *they* would be liable only when they did so, the statute needed the under-color-of-law requirement. The only way to remove the redundancy that the Court sees would have been to eliminate the catchall phrase "person" altogether, and separately describe each category of possible defendants and the circumstances under which they might be liable. I cannot think of a situation not involving the Eleventh Amendment, however, in which we have imposed such an unforgiving drafting requirement on Congress.

Taking the example closest to this case, we might have observed in *Monell* that § 1983 was clumsily written if it included municipalities, since these, too, may act only under color of state authority. Nevertheless, we held there that the statute does apply to municipalities. 436 U. S., at 690. Similarly, we have construed the statutory term "white persons" to include "'corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals,'" see *Wilson* v. *Omaha Tribe*, 442 U. S., at 666, quoting 1 U. S. C. § 1, despite the evident awkwardness in doing so. Indeed, virtually every time we construe the word "person" to include corporate or other artificial entities that are not individual, flesh-and-blood persons, some awkwardness results. But given cases like *Monell* and *Wilson*, it is difficult to understand why mere linguistic awkwardness should control where there is good reason to accept the "awkward" reading of a statute.

The legislative history and background of the statute confirm that the presumption created by the Dictionary Act was not overridden in § 1 of the 1871 Act, and that, even without such a presumption, it is plain that "person" in the 1871 Act must include the States. I discussed in detail the legislative history of this statute in my opinion concurring in the judg-

ment in *Quern* v. *Jordan*, 440 U. S., at 357–365, and I shall not cover that ground again here. Suffice it to say that, in my view, the legislative history of this provision, though spare, demonstrates that Congress recognized and accepted the fact that the statute was directed at the States themselves. One need not believe that the statute satisfies this Court's heightened clear-statement principle, reserved for Eleventh Amendment cases, in order to conclude that the language and legislative history of § 1983 show that the word "person" must include the States.

As to the more general historical background of § 1, we too easily forget, I think, the circumstances existing in this country when the early civil rights statutes were passed. "[V]iewed against the events and passions of the time," *United States* v. *Price*, 383 U. S. 787, 803 (1966), I have little doubt that § 1 of the Civil Rights Act of 1871 included States as "persons." The following brief description of the Reconstruction period is illuminating:

> "The Civil War had ended in April 1865. Relations between Negroes and whites were increasingly turbulent. Congress had taken control of the entire governmental process in former Confederate States. It had declared the governments in 10 'unreconstructed' States to be illegal and had set up federal military administrations in their place. Congress refused to seat representatives from these States until they had adopted constitutions guaranteeing Negro suffrage, and had ratified the Fourteenth Amendment. Constitutional conventions were called in 1868. Six of the 10 States fulfilled Congress' requirements in 1868, the other four by 1870.

> "For a few years 'radical' Republicans dominated the governments of the Southern States and Negroes played a substantial political role. But countermeasures were swift and violent. The Ku Klux Klan was organized by southern whites in 1866 and a similar organization appeared with the romantic title of the Knights of the

White Camellia. In 1868 a wave of murders and assaults was launched including assassinations designed to keep Negroes from the polls. The States themselves were helpless, despite the resort by some of them to extreme measures such as making it legal to hunt down and shoot any disguised man.

"Within the Congress pressures mounted in the period between the end of the war and 1870 for drastic measures. A few months after the ratification of the Thirteenth Amendment on December 6, 1865, Congress, on April 9, 1866, enacted the Civil Rights Act of 1866 . . . . On June 13, 1866, the Fourteenth Amendment was proposed, and it was ratified in July 1868. In February 1869 the Fifteenth Amendment was proposed, and it was ratified in February 1870. On May 31, 1870, the Enforcement Act of 1870 was enacted." *Id.*, at 803–805 (footnotes omitted).

This was a Congress in the midst of altering the " 'balance between the States and the Federal Government.' " *Ante*, at 65, quoting *Atascadero State Hospital* v. *Scanlon*, 473 U. S., at 242. It was fighting to save the Union, and in doing so, it transformed our federal system. It is difficult, therefore, to believe that this same Congress did not intend to include States among those who might be liable under § 1983 for the very deprivations that were threatening this Nation at that time.

III

To describe the breadth of the Court's holding is to demonstrate its unwisdom. If States are not "persons" within the meaning of § 1983, then they may not be sued under that statute regardless of whether they have consented to suit. Even if, in other words, a State formally and explicitly consented to suits against it in federal or state court, no § 1983 plaintiff could proceed against it because States are not within the statute's category of possible defendants.

This is indeed an exceptional holding. Not only does it depart from our suggestion in *Alabama* v. *Pugh*, 438 U. S. 781, 782 (1978), that a State could be a defendant under § 1983 if it consented to suit, see also *Quern* v. *Jordan, supra,* at 340, but it also renders ineffective the choices some States have made to permit such suits against them. See, *e. g., Della Grotta* v. *Rhode Island,* 781 F. 2d 343 (CA1 1986). I do not understand what purpose is served, what principle of federalism or comity is promoted, by refusing to give force to a State's explicit consent to suit.

The Court appears to be driven to this peculiar result in part by its view that "in enacting § 1983, Congress did not intend to override well-established immunities or defenses under the common law." *Ante,* at 67. But the question whether States are "persons" under § 1983 is separate and distinct from the question whether they may assert a defense of common-law sovereign immunity. In our prior decisions involving common-law immunities, we have not held that the existence of an immunity defense excluded the relevant state actor from the category of "persons" liable under § 1983, see, *e. g., Forrester* v. *White,* 484 U. S. 219 (1988), and it is a mistake to do so today. Such an approach entrenches the effect of common-law immunity even where the immunity itself has been waived.

For my part, I would reverse the judgment below and remand for resolution of the question whether Michigan would assert common-law sovereign immunity in defense to this suit and, if so, whether that assertion of immunity would preclude the suit.

Given the suggestion in the court below that Michigan enjoys no common-law immunity for violations of its own Constitution, *Smith* v. *Department of Public Health,* 428 Mich. 540, 641–642, 410 N. W. 2d 749, 793–794 (1987) (Boyle, J., concurring), there is certainly a possibility that that court would hold that the State also lacks immunity against § 1983 suits for violations of the Federal Constitution.

Moreover, even if that court decided that the State's waiver of immunity did not apply to § 1983 suits, there is a substantial question whether Michigan could so discriminate between virtually identical causes of action only on the ground that one was a state suit and the other a federal one. Cf. *Testa* v. *Katt*, 330 U. S. 386 (1947); *Martinez* v. *California*, 444 U. S. 277, 283, n. 7 (1980). Finally, even if both of these questions were resolved in favor of an immunity defense, there would remain the question whether it would be reasonable to attribute to Congress an intent to allow States to decide for themselves whether to take cognizance of § 1983 suits brought against them. Cf. *Martinez, supra*, at 284, and n. 8; *Owen* v. *City of Independence*, 445 U. S. 622, 647–648 (1980).

Because the court below disposed of the case on the ground that States were not "persons" within the meaning of § 1983, it did not pass upon these difficult and important questions. I therefore would remand this case to the state court to resolve these questions in the first instance.

JUSTICE STEVENS, dissenting.

Legal doctrines often flourish long after their *raison d'être* has perished.[1] The doctrine of sovereign immunity rests on the fictional premise that the "King can do no wrong."[2] Even though the plot to assassinate James I in 1605, the exe-

---

[1] "A very common phenomenon, and one very familiar to the student of history, is this. The customs, beliefs, or needs of a primitive time establish a rule or a formula. In the course of centuries the custom, belief, or necessity disappears, but the rule remains. The reason which gave rise to the rule has been forgotten and ingenious minds set themselves to inquire how it is to be accounted for. Some ground of policy is thought of, which seems to explain it and to reconcile it with the present state of things; and then the rule adapts itself to the new reasons which have been found for it, and enters on a new career. The old form receives a new content, and in time even the form modifies itself to fit the meaning which it has received." O. Holmes, The Common Law 8 (M. Howe ed. 1963).

[2] See 1 W. Blackstone, Commentaries *246 ("The king, moreover, is not only incapable of *doing* wrong, but even of *thinking* wrong; he can never mean to do an improper thing").

cution of Charles I in 1649, and the Colonists' reaction to George III's stamp tax made rather clear the fictional character of the doctrine's underpinnings, British subjects found a gracious means of compelling the King to obey the law rather than simply repudiating the doctrine itself. They held his advisers and his agents responsible.[3]

In our administration of § 1983, we have also relied on fictions to protect the illusion that a sovereign State, absent consent, may not be held accountable for its delicts in federal court. Under a settled course of decision, in contexts ranging from school desegregation to the provision of public

---

[3] In the first chapter of his classic History of England, published in 1849, Thomas Macaulay wrote:

"Of these kindred constitutions the English was, from an early period, justly reputed the best. The prerogatives of the sovereign were undoubtedly extensive.

.      .      .      .      .

"But his power, though ample, was limited by three great constitutional principles, so ancient that none can say when they began to exist, so potent that their natural development, continued through many generations, has produced the order of things under which we now live.

"First, the King could not legislate without the consent of his Parliament. Secondly, he could impose no tax without the consent of his Parliament. Thirdly, he was bound to conduct the executive administration according to the laws of the land, and, if he broke those laws, his advisers and his agents were responsible." 1 T. Macaulay, History of England 28–29.

In the United States as well, at the time of the passage of the Civil Rights Act of 1871, actions against agents of the sovereign were the means by which the State, despite its own immunity, was required to obey the law. See, e. g., Poindexter v. Greenhow, 114 U. S. 270, 297 (1885) ("The fancied inconvenience of an interference with the collection of its taxes by the govenment of Virginia, by suits against its tax collectors, vanishes at once upon the suggestion that such interference is not possible, except when that government seeks to enforce the collection of its taxes contrary to the law and contract of the State, and in violation of the Constitution of the United States"); Davis v. Gray, 16 Wall. 203, 220 (1873) ("Where the State is concerned, the State should be made a party, if it could be done. That it cannot be done is a sufficient reason for the omission to do it, and the court may proceed to decree against the officers of the State in all respects as if the State were a party to the record").

assistance benefits to the administration of prison systems and other state facilities, we have held the States liable under § 1983 for their constitutional violations through the artifice of naming a public officer as a nominal party. Once one strips away the Eleventh Amendment overlay applied to actions in federal court, it is apparent that the Court in these cases has treated the State as the real party in interest both for the purposes of granting prospective and ancillary relief and of denying retroactive relief. When suit is brought in state court, where the Eleventh Amendment is inapplicable, it follows that the State can be named directly as a party under § 1983.

An official-capacity suit is the typical way in which we have held States responsible for their duties under federal law. Such a suit, we have explained, "'generally represent[s] only another way of pleading an action against an entity of which an officer is an agent.'" *Kentucky* v. *Graham*, 473 U. S. 159, 165 (1985) (quoting *Monell* v. *New York City Dept. of Social Services*, 436 U. S. 658, 690, n. 55 (1978)); see also *Pennhurst State School and Hospital* v. *Halderman*, 465 U. S. 89, 101 (1984). In the peculiar Eleventh Amendment analysis we have applied to such cases, we have recognized that an official-capacity action is in reality always against the State and balanced interests to determine whether a particular type of relief is available. The Court has held that when a suit seeks equitable relief or money damages from a state officer for injuries suffered in the past, the interests in compensation and deterrence are insufficiently weighty to override the State's sovereign immunity. See *Papasan* v. *Allain*, 478 U. S. 265, 278 (1986); *Green* v. *Mansour*, 474 U. S. 64, 68 (1985); *Edelman* v. *Jordan*, 415 U. S. 651, 668 (1974). On the other hand, although prospective relief awarded against a state officer also "implicate[s] Eleventh Amendment concerns," *Mansour*, 474 U. S., at 68, the interests in "end[ing] a continuing violation of federal law," *ibid.*, outweigh the interests in state sovereignty and justify

an award under § 1983 of an injunction that operates against the State's officers or even directly against the State itself. See, *e. g.*, *Papasan, supra*, at 282; *Quern* v. *Jordan*, 440 U. S. 332, 337 (1979); *Milliken* v. *Bradley*, 433 U. S. 267, 289 (1977).

In *Milliken* v. *Bradley, supra*, for example, a unanimous Court upheld a federal-court order requiring the State of Michigan to pay $5,800,000 to fund educational components in a desegregation decree "notwithstanding [its] *direct* and substantial impact on the state treasury." *Id.*, at 289 (emphasis added).[4] As Justice Powell stated in his opinion concurring in the judgment, "the State [had] been adjudged a participant in the constitutional violations, and the State therefore may be ordered to participate prospectively in a remedy otherwise appropriate." *Id.*, at 295. Subsequent decisions have adhered to the position that equitable relief—even "a remedy that might require the expenditure of state funds," *Papasan, supra*, at 282—may be awarded to ensure future compliance by a State with a substantive federal question determination. See also *Quern* v. *Jordan*, 440 U. S., at 337.

Our treatment of States as "persons" under § 1983 is also exemplified by our decisions holding that ancillary relief, such as attorney's fees, may be awarded directly against the State. We have explained that "liability on the merits and responsibility for fees go hand in hand; where a defendant has not been prevailed against, either because of legal immunity

---

[4] We noted in *Hutto* v. *Finney*, 437 U. S. 678, 692, n. 20 (1978):

"In *Milliken* v. *Bradley*, [433 U. S. 267 (1977)], we affirmed an order requiring a state treasurer to pay a substantial sum to another litigant, even though the District Court's opinion explicitly recognized that 'this remedial decree will be paid for by the taxpayers of the City of Detroit and the State of Michigan,' App. to Pet. for Cert. in *Milliken* v. *Bradley*, O. T. 1976, No. 76–447, pp. 116a–117a, and even though the Court of Appeals, in affirming, stated that 'the District Court ordered that the State and Detroit Board each pay one-half the costs' of relief. *Bradley* v. *Milliken*, 540 F. 2d 229, 245 (CA6 1976)."

or on the merits, § 1988 does not authorize a fee award against that defendant." *Kentucky* v. *Graham, supra,* at 165. Nonetheless, we held in *Hutto* v. *Finney,* 437 U. S. 678 (1978), a case challenging the administration of the Arkansas prison system, that a Federal District Court could award attorney's fees directly against the State under § 1988,[5] *id.,* at 700; see *Brandon* v. *Holt,* 469 U. S. 464, 472 (1985), and could assess attorney's fees for bad-faith litigation under § 1983 "'to be paid out of Department of Corrections funds.'" 437 U. S., at 692. In *Supreme Court of Virginia* v. *Consumers Union of United States, Inc.,* 446 U. S. 719, 739 (1980), JUSTICE WHITE reaffirmed for a unanimous Court that an award of fees could be entered against a State or state agency, in that case a State Supreme Court, in an injunctive action under § 1983.[6] In suits commenced in state court, in which there is no independent reason to require parties to sue nominally a state officer, we have held that attor-

[5] We explained that the legislative history evinced Congress' intent that attorney's fees be assessed against the State:

"The legislative history is equally plain: '[I]t is intended that the attorneys' fees, like other items of costs, will be collected either directly from the official, in his official capacity, from funds of his agency or under his control, or from the State or local government (whether or not the agency or government is a named party).' S. Rep. No. 94–1011, p. 5 (1976) (footnote omitted). The House Report is in accord: 'The greater resources available to governments provide an ample base from which fees can be awarded to the prevailing plaintiff in suits against governmental officials or entities.' H. R. Rep. No. 94–1558, p. 7 (1976). The Report added in a footnote that: 'Of course, the 11th Amendment is not a bar to the awarding of counsel fees against state governments. *Fitzpatrick* v. *Bitzer.*' *Id.,* at 7, n. 14. Congress' intent was expressed in deeds as well as words. It rejected at least two attempts to amend the Act and immunize state and local governments from awards." *Hutto, supra,* at 694.

[6] The Court is surely incorrect to assert that a determination that a State is a person under § 1983 was unnecessary to our decisions awarding attorney's fees against a State or state agency. *Ante,* at 63, n. 4. If there was no basis for liability because the State or state agency was not a party under § 1983, it is difficult to see how there was a basis for imposition of fees.

ney's fees can be awarded against the State in its own name. See *Maine* v. *Thiboutot*, 448 U. S. 1, 10–11 (1980).[7]

The Civil Rights Act of 1871 was "intended to provide a remedy, to be broadly construed, against all forms of official violation of federally protected rights." *Monell* v. *New York City Dept. of Social Services*, 436 U. S., at 700–701. Our holdings that a § 1983 action can be brought against state officials in their official capacity for constitutional violations properly recognize and are faithful to that profound mandate. If prospective relief can be awarded against state officials under § 1983 and the State is the real party in interest in such suits, the State must be a "person" which can be held liable under § 1983. No other conclusion is available. Eleventh Amendment principles may limit the State's capacity to be sued as such in federal court. See *Alabama* v. *Pugh*, 438 U. S. 781 (1978). But since those principles are not applicable to suits in state court, see *Thiboutot, supra,* at 9, n. 7; *Nevada* v. *Hall*, 440 U. S. 410 (1979), there is no need to resort to the fiction of an official-capacity suit and the State may and should be named directly as a defendant in a § 1983 action.

The Court concludes, however, that "a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983," *ante,* at 71, n. 10, while that same party sued in the same official capacity is not a person when the plaintiff seeks monetary relief. It cites in support of this proposition cases such as *Osborn* v. *Bank of United States,* 9 Wheat. 738 (1824), in which the Court through Chief Justice Marshall held that an action against a state auditor to recover taxes illegally collected did not constitute an action against the State. This line of authority, the Court states, "would

---

[7] Indeed, we have never questioned that a State is a proper defendant in a § 1983 action when the State has consented to being joined in its own name in a suit in federal court, see *Alabama* v. *Pugh*, 438 U. S. 781 (1978), or has been named as a defendant in an action in state court, see *Maine* v. *Thiboutot*, 448 U. S. 1 (1980); *Martinez* v. *California*, 444 U. S. 277 (1980).

not have been foreign to the 19th-century Congress that enacted § 1983." *Ante*, at 71, n. 10.

On the Court's supposition, the question would be whether the complaint against a state official states a claim for the type of relief sought, not whether it will have an impact on the state treasury. See, *e. g.*, *Governor of Georgia* v. *Madrazo*, 1 Pet. 110, 124 (1828). At least for actions in state court, as to which there could be no constitutional reason to look to the effect on the State, see *Edelman* v. *Jordan*, 415 U. S. 651 (1974), the Court's analysis would support actions for the recovery of chattel and real property against state officials both of which were well known in the 19th century. See *Poindexter* v. *Greenhow*, 114 U. S. 270 (1884); *United States* v. *Lee*, 106 U. S. 196 (1882). Although the conclusion that a state officer sued for damages in his or her official capacity is not a "person" under § 1983 would not quite follow,[8] it might nonetheless be permissible to assume that the 1871 Congress did not contemplate an action for damages payable not by the officer personally but by the State.

The Court having constructed an edifice for the purposes of the Eleventh Amendment on the theory that the State is always the real party in interest in a § 1983 official-capacity action against a state officer, I would think the majority would be impelled to conclude that the State is a "person" under § 1983. As JUSTICE BRENNAN has demonstrated, there is also a compelling textual argument that States are persons under § 1983. In addition, the Court's construction draws an illogical distinction between wrongs committed by county or municipal officials on the one hand, and those committed by state officials on the other. Finally, there is no necessity to

---

[8] Cf. *City of Kenosha* v. *Bruno*, 412 U. S. 507, 513 (1973) ("We find nothing in the legislative history discussed in *Monroe* [v. *Pape*, 365 U. S. 167 (1961)], or in the language actually used by Congress, to suggest that the generic word 'person' in § 1983 was intended to have a bifurcated application to municipal corporations depending on the nature of the relief sought against them").

import into this question of statutory construction doctrine created to protect the fiction that one sovereign cannot be sued in the courts of another sovereign. Aside from all of these reasons, the Court's holding that a State is not a person under § 1983 departs from a long line of judicial authority based on exactly that premise.

I respectfully dissent.