98 F.3d 1341
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
La-Yah BEN-YAHUDAH, Plaintiff-Appellant,
v.
Dan BOLDEN, Sherry L. Burt, and Elizabeth McNamara,
Defendants-Appellees.
 No. 94-2438.
 United States Court of Appeals, Sixth Circuit.
 Oct. 3, 1996.
 
 On Appeal from the United States District Court for the Eastern District of Michigan, No. 94-71288; Barbara K. Hackett, Judge.
 E.D.Mich.
 VACATED.
 Before: NELSON and BATCHELDER, Circuit Judges, and McKEAGUE, District Judge.*
 DAVID A. NELSON, Circuit Judge.
 
 
 1
 This is an appeal from a summary judgment for the defendants in a prisoner civil rights action brought under 42 U.S.C. § 1983. The plaintiff is allegedly an elder of the House of Yahvah/Assemblies of Yahvahsha Worldwide, which is said to be a religious organization. The defendants--officials of the Michigan Department of Corrections--declined to let the plaintiff and other "Yahudah" prisoners, as they sometimes style themselves, participate in Yahudah congregational worship services.
 
 
 2
 Noting that numerous other religious groups are permitted to conduct services in prison, the plaintiff complains that the Yahudahs have been subjected to a discriminatory application of an official "Policy Directive" dealing with prisoner religious practices. As a result of this discriminatory application, he says, the defendants have wrongfully prohibited the free exercise of his religion.
 
 
 3
 In the apparent belief that the case turned on the constitutionality of the Policy Directive itself, the district court held the Directive constitutional. The plaintiff, however, made it clear that he was not challenging the Directive; what he was challenging was the allegedly improper manner in which the Directive was applied to him.
 
 
 4
 Finding ourselves uncertain as to the appropriate disposition of the plaintiff's "as applied" challenge, we shall vacate the judgment and remand the case with instructions to address the specific issue that the plaintiff raised. In carrying out this task the district court will need to consider the newly-enacted Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb-1 et seq. The district court may also need to decide whether the defendants are entitled to qualified immunity.
 
 
 5
 * The plaintiff, LAH-Yah-KHI-Ya YL Ben-Yahudah (hereinafter "Mr. Ben-Yahudah"), is an inmate at the Ryan Regional Correctional Facility at Detroit, Michigan. In 1992, it appears, Mr. Ben-Yahudah and several of his associates were issued "details" to attend Jewish religious services conducted by a rabbi.
 
 
 6
 The record shows that the rabbi eventually stopped coming to the prison. Mr. Ben-Yahudah's group continued to meet on its own for a time, adopting some changes in religious doctrine along the way, but on September 29, 1993, defendant Elizabeth McNamara--then an Assistant Deputy Warden at the Ryan facility--ordered cancellation of the religious details. This action was taken pursuant to Michigan Department of Corrections Policy Directive 05.03.150 (Subject, "Religious Beliefs and Practices of Prisoners"), Mr. Ben-Yahudah's group not having been qualified under the Directive as a recognized religious group.
 
 
 7
 Part III J of the Policy Directive, captioned "Recognition of Religions," provides as follows:
 
 
 8
 "A group of prisoners wishing to meet as a new religious group shall submit a request in writing to the warden. In cases where the warden is unfamiliar with a religion, or believes that it is not legitimate, the group shall be required to submit its religious literature, including the group[']s beliefs and practices, to the warden. S/he shall refer the request and supporting documents to the Deputy Director of the Bureau of Correctional Facilities (BCF) or his/her designee who shall present the material to the Chaplaincy Advisory Council (CAC) for the review if needed. The CAC shall make a recommendation to the BCF Deputy Director or his/her designee as to whether the group should be recognized as a true religion."
 
 
 9
 Pursuant to the Directive, it appears, a member of Mr. Ben-Yahudah's group sent a letter to defendant Sherry L. Burt, the Warden of the Ryan facility, asking that the Yahudahs (also referred to in the letter as "Hebrew Israelite Jews") be recognized as a legitimate religious organization. The letter was received in the warden's office on July 22, 1993, and there is evidence that similar requests had been submitted by Mr. Ben-Yahudah earlier.
 
 
 10
 The requests for recognition were supplemented at various times by religious literature and correspondence submitted by one L.M. Felder. Mr. Felder, the "Chief Hebrew Overseer of the Assemblies of Ya HVaHOSHA-Worldwide," eventually provided a certificate of incorporation, dated September 22, 1993, showing that the Assemblies had been organized as a non-profit corporation in the District of Columbia. Also submitted was a set of by-laws for a "branch assembly" chaired by Mr. Ben-Yahudah. The by-laws listed 11 inmates, including Mr. Ben-Yahudah, as "Hebrew Yahudi" at the Ryan facility.
 
 
 11
 In November of 1993, acting in accordance with the Policy Directive, Warden Burt transmitted the Yahudahs' literature to the Chaplaincy Advisory Council for review. The composition and function of the Council are described as follows in Part III G of the Policy Directive:
 
 
 12
 "A Chaplaincy Advisory Council, comprised of representatives of various religions and denominations, shall serve in an advisory capacity to the Department regarding religious policy and programming. The BCF Deputy Director or his/her designee will be a member of the CAC and ensure that all major religions are represented. Organization and membership of the CAC is governed by its constitution and bylaws with the approval of the BCF Deputy Director."
 
 
 13
 Over the signatures of 12 members (including the chairman and vice-chairman), the Council issued a written response on May 26, 1994. After listing the materials that had been reviewed, the Council made this finding and recommendation:
 
 
 14
 "We find that [the Yahudahs'] tennets [sic] of religion is [sic] a compilation of Christian beliefs with an addition of syncretistic tennets [sic] of Jewish and Islamic beliefs and practices. We recommend that they be allowed to practice their religion individually in accordance with departmental policy and attend existing Christian services which will provide for their group meeting needs."
 
 
 15
 Defendant Dan Bolden, a Deputy Director of the Department of Corrections, sent a memorandum to Warden Burt on June 23, 1994, telling her that he agreed with the Council. The Yahudahs he concluded, "will not be recognized as a separate new religious group but rather as a sect of Christianity."
 
 
 16
 Mr. Ben-Yahudah had already commenced the present civil rights action, complaining of his failure to receive permission to continue his religious services "while many other prisoners are being allowed to enjoy their first amendment right to practice their religion unrestrained." The complaint specified that the defendants were being sued both individually and in their official capacities. In addition to seeking declaratory and injunctive relief, the complaint asked for monetary damages in a substantial amount.
 
 
 17
 On July 8, 1994, the defendants moved for dismissal under Rule 12(b), Fed.R.Civ.P., and for summary judgment under Rule 56. The motion, which was accompanied by exhibits that included affidavits from the three defendants, asserted that the plaintiff had failed to plead a violation of the Constitution; that summary judgment should be entered in any event, the plaintiff being unable to show any genuine issue of material fact that would defeat the defendants' entitlement to judgment as a matter of law; that monetary damages could not be recovered from the defendants in their official capacities because of Michigan's Eleventh Amendment immunity from suit; and that monetary damages could not be recovered from the defendants in their individual capacities because the defendants were entitled to qualified immunity.
 
 
 18
 Mr. Ben-Yahudah promptly filed a responsive brief. In it he contended that material issues of fact precluded summary judgment and that the defendants were not entitled to qualified immunity because they should have known that they were violating the plaintiff's constitutional rights.
 
 
 19
 The matter was referred to a magistrate judge for review. On August 31, 1994, the magistrate issued a report and recommendation in which he analyzed the constitutionality of the Policy Directive under a "reasonableness" test, see O'Lone v. Estate of Shabazz, 482 U.S. 342, 349 (1987), and concluded that the Directive passed the test. He did not address the reasonableness of the proposition that the plaintiff's "group meeting needs" could be met by attendance at "existing Christian services."
 
 
 20
 The Religious Freedom Restoration Act does not appear to have been called to the magistrate's attention, and his report made no reference to that statute. Neither did the report mention the claim of Eleventh Amendment immunity. The report did, however, conclude that the doctrine of qualified immunity was inapplicable, the plaintiff having failed to establish a constitutional violation.
 
 
 21
 Mr. Ben-Yahudah filed timely objections to the report and recommendation, stating among other things that he "is not a christian and doesn't accept christian theology;" that no penological interest was served by allowing Christian Scientists, Mormons, Jehovah's Witnesses, generic Protestants, Roman Catholics, and Seventh Day Adventists all to meet separately for religious services, while denying the Yahudahs a similar privilege; and that neither Policy Directive 05.03.150 nor the procedure it established for granting recognition to religious groups was being challenged. Rather, Mr. Ben-Yahudah explained, the challenge was to what he characterized as "deliberate indifference to his religious needs and rights where others were allowed to meet and hold congregate services with the service of [their] faith...." (Emphasis supplied.)
 
 
 22
 In October of 1994 the district court entered a brief order rejecting the plaintiff's objections as "without merit." The order adopted the magistrate's report and recommendation as the findings and conclusions of the court, and it granted the defendants' motion for summary judgment. This appeal followed.
 
 II
 
 23
 As we have seen, Mr. Ben-Yahudah does not contest the constitutionality of the procedure under which the Deputy Director decides whether a group such as the Yahudahs will be "recognized as a true religion."[1] The fact that the procedure may pass constitutional muster, however, does not mean that every decision reached in accordance with the procedure will necessarily pass constitutional muster too. If, for example, the Policy Directive were applied to deny separate congregational worship privileges to Muslim prisoners on the ground that Muslims are a Christian sect, Muslim prisoners affected by such a decision might well have a viable civil rights claim.
 
 
 24
 On the record presented here, it is by no means clear to us that Deputy Director Bolden acted within the proper scope of his discretion in determining that the Yahudahs are a "sect of Christianity" so closely related to one or more of the recognized Christian groups as to negate any need for separate services. In this connection we note that the Yahudahs' literature states, among other things, that the observance of such holidays as Ash Wednesday, Good Friday, Easter, and Christmas constitutes a "PAGAN" custom. One can point to Christian groups that would have agreed as to one or more of these holidays--the Seventh Century English Puritans come to mind--but it is not self-evident that the Twentieth Century Christian worship services currently available at the Ryan facility would reasonably meet the needs of either a Puritan or a Yahudah. We would have benefited from having the district court's findings and conclusions on these matters, whether based on the existing record or a more fully developed one.
 
 
 25
 A remand would have been appropriate, in our view, even if the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb-1 et seq., had not been enacted by Congress in 1993. Because that statute is now in effect, however, and because prisons are not exempt from its broad language, see Werner v. McCotter, 49 F.3d 1476, 1479-80 (10th Cir.), cert. denied, 115 S.Ct. 2625 (1995), it will obviously be necessary for the district court to analyze the case within the framework established by the statute.
 
 
 26
 Giving "due deference to the experience and expertise" of the defendant prison administrators, and taking account of "consideration[s] of costs and limited resources," see S.Rep. No. 111, 103rd Cong., 1st Sess. at 1900, the district court will need to determine whether Deputy Director Bolden's decision is one that "substantially burden[s]" the exercise of Mr. Ben-Yahudah's religion. See 42 U.S.C. § 2000bb-1(a). If the court finds that such a burden has been imposed here, it will then need to decide whether the defendants have demonstrated that the application of the burden to Mr. Ben-Yahudah
 
 
 27
 "(1) is in furtherance of a compelling governmental interest; and
 
 
 28
 (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b).
 
 
 29
 If the district court concludes that the case can be summarily decided in favor of the defendants under the statute, there will be no need to give further consideration to the defendants' assertion of qualified immunity. Otherwise, however, the defendants will be entitled to a prompt resolution of the qualified immunity issue. The possibility of a monetary damage award entered against the defendants in their personal capacities is a sword that should not be permitted to hang over their heads any longer than necessary if, as we think likely, the doctrine of qualified immunity applies here.[2]
 
 
 30
 For the reasons stated, the judgment entered by the district court on October 27, 1994, is VACATED, and the case is REMANDED for further proceedings not inconsistent with this opinion.
 
 
 
 *
 The Honorable David W. McKeague, United States District Judge for the Western District of Michigan, sitting by designation
 
 
 [1]
 The State of Michigan obviously has no business deciding whether any religion is "true" in a theological sense, but we assume for purposes of this opinion that it is not inappropriate for the state to determine whether a group of prisoners seeking permission to worship together will in fact be meeting for purposes that can fairly be termed "religious." We likewise assume that the state may appropriately decide whether such a group's needs can be met by attendance at the religious services of some other group, one that has already achieved recognition
 
 
 [2]
 Insofar as Mr. Ben-Yahudah seeks an award of monetary damages against the defendants in their official capacities, it is well established that his claim is barred. See Will v. Michigan Department of State Police, 491 U.S. 58 (1989); Abdur-Rahman v. Michigan Department of Corrections, 65 F.3d 489 (1995)