WILLIAMS et al., Appellants and Cross–Appellees,

v.

FRANKLIN COUNTY BOARD OF COMMISSIONERS et al., Appellees;
Flowers et al., Appellees and Cross–Appellants.

[Cite as *Williams v. Franklin Cty. Bd. of Commrs.* (2001), 145 Ohio App.3d 530.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 01AP–153.

Decided Aug. 28, 2001.

532

534

*Zach Zunshine,* for appellants and cross-appellees.

*Ron O'Brien,* Franklin County Prosecuting Attorney, *Robert E. Williams* and *Tracie M. Boyd,* Assistant Prosecuting Attorneys, for appellees and cross-appellants.

BOWMAN, Judge:

In March 1997, Michael E. Williams and his wife, Tammie Williams, lived in Grove City with their five children, ages eight to seventeen. On March 6, 1997, Michael Williams was arrested and charged with domestic violence as a result of an altercation between Williams and his son, Jason Williams, who was sixteen years old at the time. In the wake of the arrest, the Williamses' five children were temporarily removed from their home by Franklin County Children Services. Eventually, the criminal case against Michael Williams was dismissed and all the children were returned to their parents.

Michael and Tammie Williams and their oldest daughter, Amanda Williams ("plaintiffs"), then filed the instant lawsuit, in which they alleged a variety of federal and state law claims against several defendants. Michael and Tammie Williams asserted federal claims under Section 1983, Title 42, U.S.Code, against Samuel Flowers and Robert Schirtzinger, the Franklin County Deputy Sheriffs who arrested Michael Williams. Michael and Tammie Williams alleged that the deputies violated the Williamses' constitutional rights by entering their home without a warrant. Michael Williams also alleged that the deputies violated his federal constitutional rights by arresting him without probable cause. Michael

Williams asserted state law claims against the deputies for false arrest/false imprisonment and for malicious prosecution.

Michael and Tammie Williams further asserted claims under Section 1983, Title 42, U.S.Code, against Franklin County Children Services ("FCCS") and its employees, Suzanne Sunshine, Rachel Hodesh, Dana Colon, and Linda Graves, and the Franklin County Board of Commissioners, alleging that these defendants violated Michael and Tammie Williams' constitutional rights when they removed the children from the Williamses' home. Amanda Williams alleged a Section 1983 claim against FCCS and its employees, alleging that she was unlawfully removed from her parents' home. Michael and Tammie Williams also asserted a state law claim for abuse of process against Sunshine, Hodesh, and Colon, alleging that these defendants unlawfully used the juvenile court system to retaliate against Michael and Tammie Williams. Plaintiffs requested compensatory and punitive damages, and a declaratory judgment.

Several of these claims were dismissed by the court prior to trial. On January 14, 1999, the trial court granted partial judgment on the pleadings in favor of FCCS and its employees, and the Franklin County Board of Commissioners. In its decision, the trial court concluded that these defendants were entitled to immunity from the state law claims by virtue of R.C. 2744.02. As to the Section 1983 claims, the trial court concluded that plaintiffs had alleged no set of facts that would indicate that these defendants had violated plaintiffs' constitutional rights. The trial court declined, however, to dismiss the declaratory judgment action against these defendants.

The parties then filed cross-motions for summary judgment. Although the parties offered slightly different versions of the facts, most of the essential evidence was as follows: Michael and Jason Williams got into an argument on March 6, 1997, when Michael refused to allow Jason to attend a youth group activity. Michael threatened to smack Jason, and Jason said he would smack back. Michael approached Jason. Jason grabbed Michael. The two struggled and Michael eventually restrained his son. Jason struck his head on something, which caused a minor wound. Michael released Jason after he promised to go to his room.

Brittany Williams, who was in fifth grade at the time, called 911 while her father and brother were fighting. Deputies Flowers and Schirtzinger were dispatched to investigate. When they arrived, the deputies observed that Tammie Williams had been crying. She told them that her husband and son had gotten into an altercation but that the problem had been resolved. The deputies entered the home without a warrant and without invitation. They interviewed Tammie, Michael, and Jason. They observed that Jason had been crying and

that his face was red. Michael Williams was arrested and charged with domestic violence.

The next morning, Brittany Williams was crying at school and she told her teacher that her father was in jail. Her teacher testified by affidavit that Brittany stated that she was afraid of her father and afraid to go home. Brittany related the same concerns to the school principal, who notified FCCS. FCCS caseworker Suzanne Sunshine interviewed Brittany and her two younger brothers at their elementary school. Sunshine testified by affidavit that Brittany told her that she feared retaliation from her father. After the interview, Sunshine telephoned her supervisor, Dana Colon, who advised Sunshine to take emergency custody of the three youngest children pending further investigation.

Sunshine then spoke on the telephone to Tammie Williams and informed her that FCCS caseworker Rachel Hodesh would be visiting the Williams home to assess the situation. When Hodesh arrived, she learned about the incident between Michael and Jason, and she observed that Jason had minor injuries. Tammie Williams and all the children then went.to an FCCS intake office, where Sunshine interviewed all the Williams children. At that point, the children denied that their father had a violent temper. Based on all her interviews, however, Sunshine suggested that the children should stay with relatives while FCCS investigated further. Tammie Williams arranged for relatives to take three of the children over the weekend and informed FCCS that the two other children were already scheduled to spend the weekend in Dayton. Tammie Williams signed a safety plan, which stated that the children would stay with relatives until FCCS determined that it was safe for them to return to their parents' home.

When the investigation resumed the following Monday, March 10, 1997, FCCS employees learned that, in spite of the safety plan, the Williams children may have visited their home and/or had unsupervised contact with their father. FCCS employees also learned that Tammie and Michael Williams had a history of substance abuse. On March 12, 1997, FCCS employees filed a complaint for temporary custody of the children.

On September 30, 1999, the trial court granted in part defendants' motion for summary judgment. The trial court dismissed all remaining claims against the Franklin County Board of Commissioners on the basis that there was no evidence that the entity had any unlawful custom or practice that would have contributed to plaintiffs' allegations. The trial court also dismissed all remaining claims against FCCS and its employees on the basis that the temporary removal of the Williams children from their parents' home for investigative purposes did not amount to a constitutional violation. The trial court also determined that there was no evidence that the deputies acted with malice. The trial court concluded,

however, that issues of fact regarding whether the deputies had lawful justification to enter the Williamses' home and probable cause to arrest Michael Williams precluded resolution by summary judgment as to any of the claims against the deputies.

The case therefore went to trial on the following causes of action: (1) Tammie and Michael Williams' Section 1983 claim that Deputies Flowers and Schirtzinger violated the Williamses' constitutional rights by entering the Williamses' home without a warrant; (2) Michael Williams' Section 1983 claim that the deputies violated the Williamses' constitutional rights by arresting him without probable cause; (3) Michael Williams' state law claim against the deputies for false arrest/false imprisonment.

The following evidence was presented at trial. While Franklin County Deputy Sheriffs Samuel Flowers and Robert Schirtzinger were en route to the Williamses' home on the evening of March 6, 1997, the dispatcher informed them that more than one 911 hang-up call had been placed from the home and that the 911 operator could hear arguing and fighting in the background at the home. The dispatcher advised the deputies that the situation appeared to involve domestic violence.

When Deputies Flowers and Schirtzinger arrived at the Williamses' home, Tammie Williams answered the door. The deputies observed that she had been crying. Tammie Williams testified that she told the deputies that her husband and son had gotten into an altercation but that everything was fine. Deputy Flowers testified that Tammie Williams stated that her husband and son had been in a fight.

The deputies entered the home to assess the situation. They admitted that they did not ask permission to enter, and Tammie Williams testified that Flowers pushed past her to get inside the home. The deputies walked directly to the kitchen, where Michael Williams was seated at the table. They asked Michael Williams what had happened. Flowers testified as follows regarding Michael Williams' description of the incident:

"* * * Mr. Williams told me that him and Jason got into an argument. Jason was getting cocky with him, gave him a look like he was going to—well, I guess, you would call it bad or whatever.

"Mr. Williams sort of—he says, you know, how the boy, he pointed—Jason put his hands up and he took [Mr. Williams] into the wall, grabbed him and took him into the wall and took him to the ground. [Mr. Williams] hit [Jason] a couple of times more or less to let him know who the boss was."

Flowers testified that Michael Williams shouted at the deputies and used profane language.

Michael Williams testified that he remained calm while the deputies questioned him. He denied using profanity or shouting, although he admitted that he asked the deputies to leave and instructed his wife to call the Franklin County Sheriff to complain about the deputies' entry into the residence. Michael Williams denied that he told the deputies that he had hit his son. From the witness stand, Michael Williams gave the following description of the incident with Jason:

"Q: Why don't we go to the heart of the matter. Tell the jury in your own words what happened between you and Jason.

"A: Well, he asked me to go to the youth group. I said no because he didn't do his chores.

"He started yelling. I started yelling. He told me I didn't do anything around here. I told him it wasn't his concern what I did. He said he wanted to go to the group meeting and I said he didn't do his chores.

"He jumped up from the table and told me I didn't do nothing around the house and I wasn't being fair to him. We said a few words back and forth.

"He started pointing his finger and yelling. He said I didn't do nothing around the house, I wasn't being fair to him, I owed him.

"I told him I didn't owe him nothing, that if he kept raising his voice and pointing his finger I would smack him in the mouth.

"He said, if you smack me I'll smack you.

"I went to the living room to the coffee table and set my coffee down and walked over to——said, what did you say to me and about that time he tackled me from the entry to the kitchen to the front door.

"* * *

"Q: Then what happened?

"A: Well, he swung me around from the door. We fell in the kitchen. I got my hands on top of his arms and turned his face around to me and told him that I want you to go to your room. I want you to get up and quit acting crazy.

"He said, okay, Dad, so he got up and he went to his room."

Deputy Flowers testified that, after he interviewed Michael Williams, he asked to speak to Jason. According to Flowers, Michael Williams refused to allow the deputies to speak with Jason until the deputies threatened to search the house. Michael Williams testified that he responded to Flowers' request to speak to Jason by telling the deputies that they had no right to be in his house, but then he yelled for Jason to come upstairs.

The deputies testified that Jason was shaking, his face was extremely red, and he had been crying. Flowers testified that Jason's face appeared to be swollen

on one side. Deputy Schirtzinger testified that he had stated in a prior internal affairs investigation that Jason had a red mark on his face, although he admitted that he could no longer recall the mark. According to Flowers, Jason said that his father had come after Jason "as if he was going to strike him" and then "took him into the wall and to the ground and * * * hit him." Flowers testified that Jason said he was afraid of his father.

Jason Williams admitted that he had been crying a lot by the time he spoke with the deputies. At trial, Jason recounted the incident as follows:

"Q. Tell us in about as much detail as you can what exactly happened?

"A. I asked my dad if I could [go to the youth group] and he told me no. I kept asking him, asking him why. He kept telling me I didn't do my chores.

"I waited and then asked him again. He kept telling me no. After I asked him and he told me no again, I started arguing with him.

"He was trying to talk to me, calm me down and I started getting louder with him and I made him mad. He was getting louder right back.

"He said cuss words to me and I said them right back. He came up and said watch your mouth. We just started arguing back and forth then.

"Then, everything happened. I don't know every word, it was just arguing and then I said, I told him quit yelling at me. He told me I should—I started it. So, I didn't stop. I was still arguing.

"Then we were arguing and arguing and finally I just—he said if you don't be quiet I'll smack you. I said if you smack me, I'll smack you right back.

"Then he walked into the living room with a cup of coffee and came back in. He didn't lunge at me. He walked in and I—he said what did you say to me? I said if you smack me, I'll smack you back.

"Then, he lunged—he didn't lunge, he just walked across towards me like—walked up towards me and I grabbed and when I grabbed him I took him into the door. I slammed him into the door.

"* * *

"A. I spun around and——I spun around and I hit my head on the doorknob and then I let go. I tripped. That's when I——on the bookshelf I hit my elbow, forearm on the corner of the bookshelf."

Jason testified that he provided the same description to the deputies during their investigation. On cross-examination, however, Jason admitted that he "probably told" Deputy Flowers that his father had "jumped towards" him.

After the deputies questioned Michael and Jason Williams, Deputy Flowers informed Michael Williams that he was placing him under arrest for domestic

violence. Flowers testified that he arrested Michael Williams on the basis of the statements made to him by Michael and Jason Williams, and because Jason's appearance was consistent with being the victim of his father's aggression.

At the close of plaintiffs' case-in-chief, the trial court directed a verdict in favor of Deputy Schirtzinger on all claims. At the conclusion of the trial, the court directed a verdict in favor of Deputy Flowers on the Section 1983 claims. The trial court also allowed plaintiffs to amend their complaint to add a false arrest/false imprisonment claim by Tammie Williams against Deputy Flowers. Accordingly, the jury was instructed to deliberate on Tammie and Michael Williams' claims against Deputy Flowers for false imprisonment/false arrest. The jury returned a verdict in favor of Michael Williams against Deputy Flowers and awarded $15,000 in damages. The jury returned a verdict in favor of Tammie Williams against Deputy Flowers and awarded $10,000 in damages.

The trial court entered judgment on the jury's verdict. The court denied Flowers' motion for judgment notwithstanding the verdict or for a new trial. The parties filed cross-appeals to this court. On appeal, plaintiffs assign the following errors:

"1. The trial court erred when it granted directed verdicts to Appellees Flowers and Schirtzinger, allowing *only* Appellants' claim of false arrest/false imprisonment to be submitted to the jury.

"2. The trial court erred when it granted judgment on the pleadings to Children Services Appellees, dismissing all Appellants' § 1983 claims against Appellees Hodesh, Sunshine, Colon, and Graves arising out of the removal of the Appellants' minor children from home.

"3. The trial court erred when it granted summary judgment to Children Services Appellees on Appellant Amanda Williams' § 1983 claim that she was seized in violation of her Fourth Amendment rights.

"4. The trial court erred when it granted summary judgment to Children Services Appellees on Appellants' state law claims arising out of the removal of Appellants' minor children from home.

"5. The trial court erred when it granted summary judgment to Children Services Appellees on Appellants' § 1983 retaliation claim that Children Services Appellees removed the children in retaliation for parents' exercise of their constitutional rights to maintain custody and control over their children.

"6. The trial court erred when it granted summary judgment to Appellee Hodesh on Appellants' malicious prosecution claim against her.

"7. The trial court abused its discretion when it overruled as moot Appellants' motion for leave to file their Fourth Amended Complaint.

"8. The trial court abused its discretion when it overruled Appellants' motion to strike and not consider parts of Appellees' affidavits filed in support of their motion for summary judgment."

By their cross-appeal, Samuel Flowers and Robert Schirtzinger assign the following errors:

"1. The trial court erred in submitting to the jury a claim for false arrest/false imprisonment on behalf of plaintiff Tammie K. Williams.

"2. The trial court erred in failing to grant a directed verdict on plaintiff's claim for false arrest/false imprisonment against defendant Flowers.

"3. The trial court erred in denying defendant Flowers' motion for judgment notwithstanding the verdict or in the alternative for a new trial.

"4. The jury's verdict in favor of plaintiff Tammie K. Williams was [sic] against defendant Flowers was against the manifest weight of the evidence.

"5. The jury's verdict in favor of plaintiff Michael Williams Against defendant Flowers was against the manifest weight of the evidence.

"6. The trial court erred in failing to instruct the jury with defendants' proposed jury instruction No. 20 on defendant Flowers' immunity pursuant to R.C. 2744.03(A)(6).

"7. The trial court erred in failing to instruct the jury with defendants' proposed jury instruction No. 12 on the preferred arrest policy set forth in R.C. § 2935.03(B)(3).

"8. The trial court erred in failing to instruct the jury with defendants' proposed jury instruction No. 13 on primary aggressor set forth in R.C. § 2935.03(B)(3)(D).

"9. The trial court erred by failing to grant summary judgment in dismissing plaintiffs' federal constitutional claims pursuant to 42 U.S.C. § 1983 against defendants Flowers and Schirtzinger."

For clarity, we address the assignments of error out of order.

◼ Plaintiffs' third, fourth, fifth, and sixth assignments of error all pertain to the trial court's summary judgment decision in favor of FCCS and its employees regarding the removal of the Williams children from their parents' home. We address these assignments of error together and conclude that the trial court properly granted summary judgment to FCCS and its employees on plaintiffs' Section 1983 and state law claims.

◼ Appellate review of summary judgment motions is de novo. *Helton v. Scioto Cty. Bd. of Commrs.* (1997), 123 Ohio App.3d 158, 162, 703 N.E.2d 841. "When reviewing a trial court's ruling on summary judgment, the court of

appeals conducts an independent review of the record and stands in the shoes of the trial court." *Mergenthal v. Star Banc Corp.* (1997), 122 Ohio App.3d 100, 103, 701 N.E.2d 383. Civ.R. 56(C) provides that summary judgment may be granted when the moving party demonstrates that (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made. *State ex rel. Grady v. State Emp. Relations Bd.* (1997), 78 Ohio St.3d 181, 183, 677 N.E.2d 343.

Section 1983, Title 42, U.S.Code provides:

"Every person who, under color of [state law], subjects, or causes to be subjected, any citizen of the United States * * * to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress * * *."

For a plaintiff to prevail on a Section 1983 claim, "(1) the conduct in controversy must be committed by a person acting under color of state law, and (2) the conduct must deprive the plaintiff of rights, privileges or immunities secured by the Constitution or laws of the United States." *1946 St. Clair Corp. v. Cleveland* (1990), 49 Ohio St.3d 33, 34, 550 N.E.2d 456.

We conclude that the FCCS employees were entitled to summary judgment because plaintiffs failed to offer evidence demonstrating that the employees deprived plaintiffs of rights or privileges secured by federal law. Contrary to plaintiffs' assertion, the temporary removal of the Williams children for investigative purposes did not violate federal law. See *Wallace v. Franklin Cty. Children Serv.* (Dec. 23, 1997), Franklin App. No. 97APE07–930, unreported (dismissing Section 1983 claims against FCCS and its employees who removed children from their home pending an investigation because such a temporary interference with the parent-child relationship did not violate parents' constitutional rights). See, also, *Norton v. Cobb* (N.D.Ohio 1990), 744 F.Supp. 798, 802–803.

Plaintiffs contend that recent decisions from federal courts indicate that parents may bring Section 1983 claims on the basis of temporary removal of their children. In at least one of the cases cited by plaintiffs, however, the court concluded that parents' constitutional rights were not infringed when their children were removed pending an investigation. See *J.B. v. Washington Cty.* (C.A.10, 1997), 127 F.3d 919. Other cases cited by plaintiffs involve facts that are not at issue in the instant matter. See, *e.g., Croft v. Westmoreland Cty. Children & Youth Serv.* (C.A.3, 1997), 103 F.3d 1123 (concluding that children services defendants were not entitled to summary judgment on a Section 1983 claim when they removed children from their home on the basis of an uncorroborated

anonymous tip of abuse). We conclude that, on the facts of this case, plaintiffs failed to demonstrate that the FCCS employees deprived them of federal rights.

 Summary judgment in favor of the FCCS employees was warranted for the additional reason that these defendants were entitled to immunity from the Section 1983 claim. Under the doctrine of qualified immunity, public officials who perform discretionary functions are generally entitled to immunity from suit in a Section 1983 action as long as their conduct does not violate clearly established federal statutory or constitutional rights of which a reasonable person would have known. *Cook v. Cincinnati* (1995), 103 Ohio App.3d 80, 85, 658 N.E.2d 814, citing *Harlow v. Fitzgerald* (1982), 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396; *Gardenhire v. Schubert* (C.A.6, 2000), 205 F.3d 303, 310–311. "The doctrine [of qualified immunity] recognizes that these officials must routinely make close decisions in the exercise of their authority and that the law that guides their conduct is often ambiguous and difficult to apply." *Murphy v. Reynoldsburg* (Aug. 8, 1991), Franklin App. No. 90AP–1296, unreported, 1991 WL 150938, *reversed on other grounds* (1992), 65 Ohio St.3d 356, 604 N.E.2d 138. "The essential rationale for granting qualified immunity is that officials should not be punished for the vigorous performance of their duties by being held liable for actions that a reasonable person would not have known violated the rights of another." *Piphus v. Blum* (1995), 108 Ohio App.3d 218, 224, 670 N.E.2d 518. Qualified immunity, therefore, encourages government officials to act without hesitation when confronted with a problem that requires a quick and decisive response and ameliorates the concern that most persons would be reluctant to participate in public service in the absence of such immunity. *Id.*

 The standard for qualified immunity is one of objective reasonableness. As such, claims of qualified immunity are to be analyzed on a fact-specific, case-by-case basis to determine whether a reasonable official in the defendant's position could have believed that his conduct was lawful, in light of clearly established law and the information that he possessed. *Pray v. Sandusky* (C.A.6, 1995), 49 F.3d 1154, 1158; see *Hicks v. Leffler* (1997), 119 Ohio App.3d 424, 427–428, 695 N.E.2d 777. The contours of the right alleged to have been violated must be sufficiently clear such that a reasonable official would understand that what he is doing violates that right. *Anderson v. Creighton* (1987), 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523. "[If] officers of reasonable competence could disagree on this issue, immunity should be recognized." *Malley v. Briggs* (1986), 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271; see *Bruce v. Ontario* (Nov. 24, 1998), Richland App. No. 98–CA–9–2, unreported, 1999 WL 4085 ("A violation of clearly established law must be so clear as to leave no doubt in the mind of a reasonable officer that his conduct was unconstitutional."). Thus, even if the

official's conduct is ultimately proved legally wrong, he still would be entitled to immunity as long as his decision was objectively reasonable. *Pray* at 1158.

 Qualified immunity provides immunity not only from liability but also from trial. The availability of qualified immunity is a question of law. *Cook*, 103 Ohio App.3d at 85, 658 N.E.2d 814. Therefore, given a particular set of facts, the issue of whether a public official did not act reasonably (and hence was not entitled to qualified immunity) is a matter for the court and may properly be determined by summary judgment. *Id.* Thus, while the court must consider the facts in the light most favorable to the nonmoving plaintiff, it is the court, and not the jury, that must determine as a matter of law whether these facts show that defendant violated clearly established legal rights of which a reasonable official would have known. *Murphy*, citing *Poe v. Haydon* (C.A.6, 1988), 853 F.2d 418, 425.

 Moreover, even on summary judgment, the ultimate burden of proof is on the plaintiff to show that defendant is not entitled to qualified immunity. *Gardenhire*, 205 F.3d at 311; *Cook* at 85, 658 N.E.2d 814; *Murphy*. The trial court must therefore grant summary judgment for defendants if the undisputed facts, and those disputed facts viewed in the plaintiff's favor, fail to establish that the defendant's conduct violated a right so clearly established that any official in his position would have clearly understood that he was under an affirmative duty to refrain from such conduct. *Cook* at 86, 658 N.E.2d 814.

Given these basic principles, the essential question in this case is whether, viewing the evidence in a light most favorable to plaintiffs, no reasonable official would conclude that there was cause to temporarily remove the Williams children from their parents' home. Plaintiffs have failed to meet this burden. The undisputed evidence demonstrates that the children were removed only after repeated interviews demonstrated that Brittany Williams was crying at school and fearful to go home; Michael Williams had been arrested for domestic violence involving his son; and Tammie and Michael Williams, who had a history of substance abuse, had demonstrated that they would not abide by a safety plan during the investigation. Under these circumstances, we conclude that the FCCS employees did not violate plaintiffs' clearly established legal rights when they removed the children from their home.

 We conclude that FCCS employees were likewise immune from liability from the state law claims. R.C. 2744.03 provides:

"(A) In a civil action brought against a political subdivision or an employee of a political subdivision to recover damages for injury, death, or loss to persons or property allegedly caused by any act or omission in connection with a governmen-

tal or proprietary function, the following defenses or immunities may be asserted to establish nonliability:

"* * *

"(6) * * * [T]he employee [of a political subdivision] is immune from liability unless one of the following applies:

"(a) His acts or omissions were manifestly outside the scope of his employment or official responsibilities;

"(b) His acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner;

"(c) Liability is expressly imposed upon the employee by a section of the Revised Code."

Whether an individual employee is entitled to immunity is a question of law. *Conley v. Shearer* (1992), 64 Ohio St.3d 284, 292, 595 N.E.2d 862. By its terms, R.C. 2744.03(A)(6) operates as a presumption of immunity. *Cook* at 90, 658 N.E.2d 814. Immunity will attach to the conduct of political subdivision employees so long as one of the exceptions does not apply. See *Miller v. Leesburg* (1993), 87 Ohio App.3d 171; 175, 621 N.E.2d 1337. Plaintiffs failed to establish that the FCCS employees were acting outside the scope of their employment or that their acts were malicious, reckless, or in bad faith.

Plaintiffs also argue that the trial court erred when it granted summary judgment in favor of FCCS and the board of county commissioners on plaintiffs' Section 1983 claims. The meaning of "person" under Section 1983, however, does not include the state, state agencies, or suits against officials acting in their official capacity. *Will v. Michigan Dept. of State Police* (1989), 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45; *Burkey v. S. Ohio Correctional Facility* (1988), 38 Ohio App.3d 170, 171, 528 N.E.2d 607. Because plaintiffs did not allege facts to state a viable Section 1983 claim against FCCS or the board of county commissioners, these agencies were entitled to judgment on the Section 1983 claims. See *Stepler v. Ohio Dept. of Rehab. & Corr.* (Jan. 21, 1997), Franklin App. No. 96APE08–1014, unreported, 1997 WL 24878. Nor did plaintiffs provide evidence of a specific policy, custom, or practice on the part of entities that would have caused the alleged unlawful conduct.

We therefore overrule plaintiffs' third, fourth, fifth, and sixth assignments of error. We overrule as moot plaintiffs' second assignment of error, which pertains to the trial court's decision granting judgment on the pleadings on plaintiffs' Section 1983 claims against FCCS employees, as the trial court also addressed the Section 1983 claims in its summary judgment ruling and we have addressed those issues in the context of summary judgment.

In their eighth assignment of error, plaintiffs argue that the trial court erred when it overruled plaintiffs' motion to strike portions of affidavits filed in support of defendants' motion for summary judgment. By its motion to strike, plaintiffs had argued that three of the affidavits contained inadmissible evidence. Specifically, plaintiffs contend that the trial court should have struck portions of the affidavits of Greg Grinch and Lloyd Cool, the teacher and principal who spoke with Brittany Williams at her school, and the affidavit of Suzanne Sunshine, one of the FCCS investigators. According to plaintiffs, the affidavits improperly relate hearsay statements purportedly made during the course of the investigation.

We conclude that the trial court did not err when it overruled plaintiffs'. motion. "It is well established that extrajudicial statements made by an out-of-court declarant are properly admissible to explain the actions of a witness to whom the statement was directed." *State v. Thomas* (1980), 61 Ohio St.2d 223, 232, 15 O.O.3d 234, 400 N.E.2d 401. The statements at issue were not offered by defendants to prove the truth of the matters asserted, but, rather, were offered to explain the actions of the FCCS employees. The statements were therefore not hearsay, see Evid.R. 801(C), and they were relevant, as they pertained to the course of the investigation by FCCS. See *id.* (noting that testimony offered to explain investigative activities was not hearsay). Accordingly, we overrule plaintiffs' eighth assignment of error.

By their seventh assignment of error, plaintiffs contend that the trial court erred when it overruled plaintiffs' motion for leave to file a fourth amended complaint. A trial court's decision denying a motion for leave to file an amended complaint will not be reversed absent an abuse of discretion. *Wilmington Steel Products, Inc. v. Cleve. Elec. Illum. Co.* (1991), 60 Ohio St.3d 120, 122, 573 N.E.2d 622. We conclude that the trial court did not abuse its discretion in denying plaintiffs' motion. By their fourth amended complaint, plaintiffs sought to add claims against a deputy sheriff who allegedly concurred with the decision by FCCS employees to remove the youngest three children from the home. By the time plaintiffs filed their fourth amended complaint, however, the trial court had already dismissed, as a matter of law, all claims pertaining to the decision to remove the children from the home. Under these circumstances, the trial court did not abuse its discretion when it overruled plaintiffs' motion to file a fourth amended complaint. Accordingly, plaintiffs' seventh assignment of error is overruled.

We turn now to defendants' cross-assignments of error pertaining to the summary judgment decision. By their ninth assignment of error, Flowers and Schirtzinger contend that the trial court erred when it failed to grant their

motion for summary judgment on plaintiffs' Section 1983 claims. Because we conclude that Flowers and Schirtzinger were entitled to immunity on the Section 1983 claims as a matter of law, we agree.

Based on the information the deputies possessed at the time, including (1) Tammie Williams' emotional state when she answered the door and her admission that her husband and son had been involved in an altercation, (2) the undisputed evidence that father and son had a physical confrontation, (3) Jason's recollection at the time that the physical confrontation began when his father "jumped at" him, and (4) Jason's emotional state and physical appearance, we conclude that a reasonable officer could have believed that he had lawful reason to enter the Williamses' home to investigate and to arrest Michael Williams. See *O'Brien v. Grand Rapids* (C.A.6, 1994), 23 F.3d 990, 1000 (though legally mistaken as to the existence of exigent circumstances to enter house without warrant, police officers were entitled to qualified immunity because it could not be said that "no reasonable officer, objectively assessing the situation, could conclude that there were exigent circumstances excusing the requirement that a warrant be obtained"). We therefore sustain defendants' ninth assignment of error. In light of our resolution of defendants' ninth assignment of error, we overrule as moot plaintiffs' first assignment of error, as we conclude that the Section 1983 claims against Flowers and Schirtzinger should not have gone to trial.

By their first and second cross-assignments of error, defendants contend that the trial court erred when it failed to direct verdicts in Deputy Flowers' favor on Michael and Tammie Williams' claims for false arrest/false imprisonment. We agree.

Civ.R. 50(A)(4) sets the following guidelines for a directed verdict:

"(4) * * * When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue."

This rule requires the trial court to give the nonmoving party the benefit of all reasonable inferences that may be drawn from the evidence. *Keeton v. Telemedia Co. of S. Ohio* (1994), 98 Ohio App.3d 405, 408, 648 N.E.2d 856, citing *Broz v. Winland* (1994), 68 Ohio St.3d 521, 526, 629 N.E.2d 395. Although a motion for directed verdict requires a trial court to review and consider the evidence, the motion does not present a question of fact or raise factual issues. *Ruta v. Breckenridge–Remy Co.* (1982), 69 Ohio St.2d 66, 23 O.O.3d 115, 430 N.E.2d 935, paragraph one of the syllabus. A motion for a

directed verdict tests the legal sufficiency of the evidence rather than its weight or the credibility of the witnesses. *Id.* at 68–69, 23 O.O.3d 115, 430 N.E.2d 935. When determining a motion for a directed verdict, therefore, the trial court must submit an essential issue to the jury if there is sufficient credible evidence to permit reasonable minds to reach different conclusions on that issue. *O'Day v. Webb* (1972), 29 Ohio St.2d 215, 58 O.O.2d 424, 280 N.E.2d 896, paragraph four of the syllabus. A motion for a directed verdict therefore presents a question of law, and our review of the lower court's judgment is *de novo. Howell v. Dayton Power & Light Co.* (1995), 102 Ohio App.3d 6, 13, 656 N.E.2d 957.

■ Flowers was entitled to a directed verdict on the claims for false arrests/false imprisonment because he was entitled to statutory immunity from that claim pursuant to R.C. 2744.03(A)(6). On appeal, plaintiffs argue that the false imprisonment jury verdict in favor of Michael Williams was proper because "there was plenty of evidence for a jury to find that Flowers did not have probable cause for the arrest of Mr. Williams." Flowers was not, however, required to prove that he had probable cause to arrest Mr. Williams. Under Ohio's statutory immunity statute, Flowers was entitled to immunity unless (1) he acted manifestly outside the scope of his official responsibilities; (2) he acted with malice, in bad faith, or in a wanton or reckless manner; or (3) liability was expressly imposed upon him by a section of the Ohio Revised Code. Because plaintiffs failed to establish any of these exceptions, they have not overcome the rebuttable presumption of statutory immunity.

Plaintiffs offered no evidence whatsoever that Flowers acted outside the scope of his official responsibilities or that liability should be imposed upon Flowers by an express provision of the Ohio Revised Code. The trial court had already ruled, as a matter of law, that Flowers did not act with malice. The record does not contain sufficient credible evidence that Flowers acted with recklessness or in bad faith. The evidence establishes that Flowers arrested Mr. Williams only after he and Schirtzinger conducted separate interviews in an effort to ascertain the details of the altercation. The undisputed evidence demonstrated that Michael and Jason Williams had physical contact and that, while Michael Williams appeared unscathed and was either calm (according to plaintiffs' testimony) or belligerent (according to defendants' testimony), Jason was extremely upset, he had been crying, and his face was red. Although plaintiffs complain that Flowers acted in bad faith when he placed handcuffs on Mr. Williams in clear view of his children, there is no evidence that Flowers did anything other than secure Mr. Williams at the time of the arrest.

■ A directed verdict in Flowers' favor on Tammie Williams' claim for false arrest/false imprisonment was warranted for the additional reason that the evidence failed to establish the elements of that claim. To prove a claim for false

imprisonment under Ohio law, a plaintiff must demonstrate that she was confined without lawful privilege and against her will or consent within a limited area for any appreciable time. *Bennett v. Ohio Dept. of Rehab. & Corr.* (1991), 60 Ohio St.3d 107, 109, 573 N.E.2d 633. Tammie Williams contends that she was the victim of false imprisonment because she was not allowed to be present when Flowers interviewed her daughter, Brittany, on the front porch of the house. According to Tammie Williams, a jury was free to deduce that Tammie Williams was falsely imprisoned, as she would need to cross the porch if she wanted to leave the house. There was no evidence whatsoever, however, that Tammie Williams expressed any desire to leave her house or that she would have been prevented had she tried. Nor was there any evidence that Tammie Williams was prevented access to the porch; Tammie Williams merely testified that she "was not allowed to go with [Brittany]" while Flowers interviewed the child on the porch. Moreover, in describing the layout of the house, Michael Williams testified that there was at least one additional means of egress, a door leading out to the garage. Under these circumstances, we conclude that there was insufficient evidence from which to find that Tammie Williams was imprisoned in her home.

Accordingly, we sustain defendants' first and second cross-assignments of error. In light of our resolution of defendants' first two assignments of error, we overrule as moot defendants' third, fourth, fifth, sixth, seventh, and eighth assignments of error.

While this appeal was pending, the parties filed two motions. On May 17, 2001, plaintiffs moved to strike the appendix attached to plaintiffs' appeals brief. By their motion, plaintiffs contended that some of the documents included in plaintiffs' appendix were not part of the record, although the only specific document cited by plaintiffs was a Joint Final Pretrial Statement. In apparent response to plaintiffs' motion, on June 7, 2001, defendants moved to supplement the record on appeal with the addition of the Joint Final Pretrial Statement. In light of our disposition of the parties' assignments of error, we deny both motions as moot, as the Joint Final Pretrial Statement was irrelevant to our disposition.

For the foregoing reasons, plaintiffs' third, fourth, fifth, sixth, seventh, and eighth assignments of error are overruled and plaintiffs' first and second assignments of error are overruled as moot. Defendants' first, second, and ninth assignments of error are sustained and defendants' third, fourth, fifth, sixth, seventh, and eighth assignments of error are overruled as moot. Plaintiffs' motion to strike the appendix and defendants' motion to supplement the record are denied as moot. The judgment of the Franklin County Court of Common Pleas is affirmed in part and reversed in part. This matter is remanded to the

trial court to enter judgment in favor of defendants' in accordance with this opinion.

> *Judgment affirmed in part,*
> *reversed in part*
> *and cause remanded with instructions.*
> *Motions denied.*

PEGGY BRYANT, P.J., and PETREE, J., concur.