Dudley D. LYNN

v.

Sgt. Edmund O'LEARY, et al.

No. CIV. JFM–01–2889.

United States District Court, D. Maryland.

May 8, 2003.

Khadijah R. Ali, Law Office of Khadijah Ali, Maria C. Mendoza, Hernandez and Associates PC, Washington, DC, for Plaintiff.

David P. Kennedy, State of Maryland Office of the Attorney General, J. Joseph Curran, Jr., Do Not Mail, Baltimore, MD, for Defendants.

## MEMORANDUM

MOTZ, District Judge.

Plaintiff, Dudley D. Lynn, has instituted this action against Defendants, Sergeant Edmund O'Leary, Sergeant Tamieka Lockley, Wayne Cusimano, and Captain Jesse Ballard III, alleging that he was subjected to an unlawful arrest, excessive force, and an illegal cavity search in violation of 42 U.S.C. § 1983. Now pending before me is Defendants' motion to dismiss the third amended complaint or, in the alternative for summary judgment. For the reasons stated below, the motion will be granted in part and denied in part.

## I.

On September 28, 2000, Dudley Lynn and his wife arrived at the Maryland House of Corrections Annex ("MHCA") in Jessup, Maryland to visit their son, Eric D. Lynn, an inmate at MHCA. (Amended Compl. ¶ 8.)[1] Mr. and Mrs. Lynn visited their son at MHCA approximately once per week. (*Id.*) On this occasion, Mr. and

---

1. My recitation of the facts is based on the allegations in the third amended complaint.

Mrs. Lynn followed the standard check-in and search procedures and went to the normal waiting area. (*Id.* ¶ 9.) As the Lynn's waited to be escorted to the visiting area, one of the MHCA K–9 officers entered the area with a search dog. As the officer entered the room, he let the dog canvass the room on a long leash. The dog approached Mr. Lynn and sniffed the area around him. The guard then pulled on the dog to search Mr. Lynn again. (*Id.* ¶ 9.) Because the dog gave a positive alert for drugs, Mr. Lynn was subjected to a pat down and his locker was searched. No drugs were found on Mr. Lynn or in his locker, and Mr. Lynn was informed that the dog had made a false alert. (*Id.* ¶ 12.)

Mr. Lynn, however, was also told that he would not be able to visit his son and that he would have to wait outside while his wife had her visit. Mrs. Lynn proceeded to visit with her son, although the visit was extremely brief because she was worried about her husband. (*Id.* ¶ 13.) When Mrs. Lynn returned to the visiting area, Mr. Lynn's driver's license was being documented. Mr Lynn was told several times that he was not being detained. As the Lynn's left the waiting area, they asked if they could speak to the warden. They were informed that the warden had been called and they waited by the exit for him to arrive. (*Id.* ¶ 14.)

After a few minutes, O'Leary and Lockley rushed into the waiting area and ordered Mr. Lynn into a side room. Mrs. Lynn was told that she had to wait outside the room. A few moments later, Ballard and Cusimano entered the side room. From outside the room, Mrs. Lynn could hear yelling and laughter. She also heard Mr. Lynn tell the officers that he had a medical condition and, at one point, heard Mr. Lynn scream in pain. Mrs. Lynn also witnessed Ballard leave the side room while cussing and yelling. Ballard pro-

ceeded to unsnap his gun holster and rush back into the room. (*Id.* ¶ 15.)

When Mr. Lynn was brought into the room, he was told by O'Leary and Cusimano that he was under arrest and that they were going to strip and cavity search him. Mr. Lynn informed the officers that he was not consenting to such a search without a search warrant. He further informed the officers that he suffered vertigo and had a serious injury to his right arm, for which he was receiving treatment. (*Id.* ¶ 16.)

Cusimano informed Mr. Lynn that they did not need him to cooperate and that they would undress him. Mr. Lynn did not assist or resist the officers while they undressed him. At one point, the officers yanked Mr. Lynn's right arm, causing him to scream in pain. The officers began to make jokes about the situation. (*Id.* ¶ 17.) While Mr. Lynn was being undressed, he began to feel dizzy. Cusimano obtained a chair for Mr. Lynn to sit on during the search. Before he could sit down, Cusimano jerked off Mr. Lynn's pants. At no time did the officers call for medical assistance or allow Mrs. Lynn to assist. (*Id.* ¶ 18.)

After removing Mr. Lynn's clothes, the officers thoroughly search the clothing and found no contraband. Additionally, Cusimano began to search Mr. Lynn's wallet. Mr. Lynn had $5,338.00 in his wallet. Cusimano took this money and split it among all of the officers in the room. Only $3,138.00 was returned to Mr. Lynn. (*Id.* ¶ 19.)

The defendants then began to search Mr. Lynn's person. Ballard and Cusimano grabbed Mr. Lynn by his arms. Ballard then yanked Mr. Lynn's underwear down to his feet. Wearing latex gloves handed to him by Lockley, O'Leary proceeded to look, probe, pull, and manipulate Mr. Lynn's groin area. The officers continued

to make jokes about Mr. Lynn while he was being searched. (*Id.* ¶ 20.)

O'Leary then moved behind Mr. Lynn, pulled his buttocks apart, and examined his rectum area with his hands. When the search was completed, Mr. Lynn was pushed onto the chair and told to get dressed. Mr. Lynn was very dizzy and told the officers that he needed Mrs. Lynn to come in to help him get dressed. The officers refused to allow Mrs. Lynn into the room. (*Id.* ¶ 21.) The officers told Mr. Lynn that they would dress him themselves. Cusimano jerked up Mr. Lynn's right leg while Ballard jerked up his left leg, causing him to fall off the chair and hit his head against the wall. When Mr. Lynn hit the wall, he was knocked unconscious. (*Id.* ¶ 22.) O'Leary then left the room to retrieve Mrs. Lynn for assistance. Mrs. Lynn entered the room and saw her husband almost completely naked and unconscious. She asked for the officers to call an ambulance. (*Id.* ¶ 23.)

After several minutes, an ambulance arrived and Mr. Lynn was taken to Howard County Hospital where he was examined by a neurologist and an orthopedist. (*Id.* ¶ 24.) Mr. Lynn suffered a contusion to the brain and injury to his back, shoulder, and arm. Moreover, Mr. Lynn has been banned from the MHCA and has been unable to visit his son since the incident. Mr. Lynn has suffered depression for which he has sought medical attention. (*Id.* ¶ 25.)

## II.

### A.

Defendants are sued in both their official and individual capacities. Defendants first argue that the claims against them in their official capacities should be dismissed. Under the Eleventh Amendment, suits against state officials in their official capacity are permitted only for injunctive relief. *See Hafer v. Melo,* 502 U.S. 21, 31, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991); *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); *Goodmon v. Rockefeller,* 947 F.2d 1186, 1187 (4th Cir.1991). Because Lynn is only seeking monetary damages, the claims against the defendants in their official capacities will be dismissed.

### B.

In Count I, Lynn's § 1983 claim, Lynn alleges violations of various constitutional rights, including unlawful arrest, illegal search, temporary imprisonment, excessive force, invasion of privacy, and violations of the equal protection and due process clauses. Defendants concede that Lynn's unlawful arrest, excessive force, and illegal search claims should not be dismissed. (Def.'s Mem. at 3–4.) Defendants, however, argue that Lynn's temporary imprisonment, invasion of privacy, equal protection, and due process claims should be dismissed.

Plaintiff's "temporary imprisonment" claim is presumably one for false imprisonment. False imprisonment is a common law claim that must be brought pursuant to state law. At the same time, a false imprisonment claim clearly implicates Lynn's right to be free from arrest without probable cause. *Carter v. Jess,* 179 F.Supp.2d 534, 540 (D.Md.2001). Because Lynn has stated a viable unlawful arrest claim, his "temporary imprisonment" claim will simply be considered part of the unlawful arrest. Thus, there will be no separate "temporary imprisonment" claim pursuant to § 1983 and any such claim will be dismissed.

Plaintiff's invasion of privacy claim is premised on a violation of substan-

tive due process. (Pl.'s Opp. at 3.) "[T]here is no general constitutional right to privacy; rather, the 'right to privacy' has been limited to matters of reproduction, contraception, abortion, and marriage ...." *Edwards v. City of Goldsboro*, 178 F.3d 231, 252 (4th Cir.1999). Lynn has not alleged facts showing an infringement of any such matters. Accordingly, Lynn's § 1983 invasion of privacy claim will be dismissed.

■■■ Defendants next challenge Lynn's equal protection claim. "In order to establish a violation of the Equal Protection Clause, Plaintiff must prove discriminatory purpose or motive." *Middlebrooks v. Univ. of Maryland at College Park*, 980 F.Supp. 824, 831 (D.Md.1997) (citing *Whiting v. Jackson State Univ.*, 616 F.2d 116, 122 (5th Cir.1980)); *see also Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 265, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). While Lynn is African–American, even viewing his allegations in the light most favorable to him, there is no basis upon which a jury could find racially discriminatory purpose or motive. In fact, there is no allegation of racial animus. Accordingly, Lynn's equal protection claim will also be dismissed.

■■■ Finally, Defendants seek dismissal of Lynn's due process claim pursuant to § 1983. In order to establish a § 1983 violation of either procedural or substantive due process, a plaintiff must show that he possesses a protected property interest. *Jenkins v. Weatherholtz*, 909 F.2d 105, 107 (4th Cir.1990); *Beck v. City of Durham*, 129 F.Supp.2d 844, 850 (M.D.N.C.2000). Lynn's due process claim alleges that he was searched without prob-

able cause. (*See* Amended Compl. ¶ 33.) Lynn does not allege any property interest.[2] Accordingly, his due process claim will also be dismissed.

## C.

■■■ Defendants next argue that they are entitled to state law government official immunity with respect to Lynn's state law claims of assault and battery, negligent failure to train/supervise, intentional infliction of emotional distress, and conversion. Under Maryland law, certain state personnel (a category it is undisputed the defendants fall under) are immune from liability for torts committed within the scope of their duties as long as they were not acting with malice and were not grossly negligent. Md.Code Ann., Cts. & Jud. Proc. § 5–522(b).

Viewing the facts in the light most favorable to the plaintiff, as I must, it is clear that Lynn has sufficiently alleged facts upon which a jury could find malice. Lynn alleges that the cavity search took place after he was told that the dog gave a false alert and not until he asked to speak to the warden. Moreover, Lynn alleges that the defendants subjected him to serious pain, ignored his medical conditions, laughed and joked throughout the incident, and caused him to be knocked unconscious.

Furthermore, Lynn's amended complaint also sufficiently alleges gross negligence. Even assuming the defendants acted without malice, their alleged failure to address his medical condition of vertigo, about which they were allegedly informed and which resulted in Lynn suffering a brain contusion, could constitute gross negligence. Accordingly, the defendants are not entitled to government official immunity.

---

**2.** Lynn does not claim that the alleged theft of his money constituted a violation of the due process clause.

### D.

■ Defendant Lockley next seeks to dismiss the claims against her in Counts II, IV, and V.[3] It is undisputed that Lockley was not in the room when the cavity search took place. Allegedly, Lockley participated in the initial arrest of Lynn, was in the room when Lynn was first arrested, and supplied O'Leary with latex gloves so that he could conduct a cavity search. Count II states a claim for assault and battery. Because there is no allegation that Lockley was even present during the removal of Lynn's clothes or the cavity search, Count II will be dismissed against Lockley.

■ Count IV states a claim for intentional infliction of emotion distress. To support a prima facie case of intentional infliction of emotional distress, a plaintiff must show: (1) the conduct is intentional or reckless; (2) the conduct is extreme and outrageous; (3) there is a causal connection between the wrongful conduct and the emotional distress; and (4) the emotional distress is severe. *Carson v. Giant Food, Inc.*, 187 F.Supp.2d 462, 482 (D.Md.2002). Based on Lynn's allegations, at most, Lockley helped arrest Lynn and handed O'Leary a pair of latex gloves. No reasonable jury could find this action constituted extreme or outrageous behavior. Accordingly, Count IV will also be dismissed against Lockley.

### E.

■ Defendants next argue that Count IV fails to state a valid claim for intentional infliction of emotional distress. Specifically, defendants argue that Lynn is unable to establish the second and fourth elements of a prima facie case. Even assuming Lynn is able to establish the second element, he is unable to establish the fourth element. "The fourth element 'requires the plaintiff to show that he suffered a *severely* disabling emotional response to the defendant's conduct.' " *Carson*, 187 F.Supp.2d at 481–82 (quoting *Bryant v. Better Bus. Bureau of Greater Maryland, Inc.*, 923 F.Supp. 720, 748 (D.Md.1996) (emphasis in original)). "The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it." *Id.* at 482. Here, Lynn offers no evidence of any severe emotional distress. Lynn only alleges that he was depressed and humiliated and spoke to his family doctor. (*See* Pl.'s Answer no. 19 to Interrogatories, Pl.'s Ex. K to Opp. to Defs.' Second Mot. to Dismiss.) Lynn concedes that he never sought any formal treatment. (*Id.*) Accordingly, summary judgment will be granted in favor of the defendants on Count IV.[4]

### F.

■ Defendants finally argue that they are entitled to qualified immunity on any claim that the arrest and search were unconstitutional. Qualified immunity shields government officials performing discretionary functions "from civil dam-

---

**3.** Lockley concedes that the claim against her in Count I should not be dismissed. Lynn, in turn, concedes that there is no claim against Lockley in Count V.

**4.** Clearly, Lynn was on notice that the motion to dismiss might be converted into a motion for summary judgment by the court. *See Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 260–61 (4th Cir.1998). Not only was defendants' motion captioned "Motion to Dismiss Third Amended Complaint or, In the Alternative, Motion for Summary Judgment," but Lynn himself submitted numerous exhibits (including transcripts of depositions of the defendants) in opposition to defendants' second motion to dismiss, which was incorporated into its opposition to the current motion.

ages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). In order to determine whether a government official is entitled to qualified immunity, I must first determine "whether a constitutional right would have been violated on the facts alleged." *Saucier v. Katz,* 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); *see also Brown v. Gilmore,* 278 F.3d 362, 367 (4th Cir.2002). Next, assuming that a violation of the right is established, I must determine whether the right was clearly established at the time such that it would be clear to an objectively reasonable officer that his conduct violated that right. *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151; *Brown,* 278 F.3d at 367.

As discussed above, *see supra* section II.B., Lynn's allegations, if proven, would establish violations of three constitutional rights: (1) the right to be free from arrest without probable cause; (2) the right to be free from unreasonable searches; and (3) the right to be free from excessive force. Viewing the facts in the light most favorable to Lynn, all three constitutional rights would have been violated. According to the defendants, "[i]t is uncontested that the defendants arrested and searched the plaintiff based on reports from [Department of Corrections] K–9 officers that a drug detection dog had alerted on the plaintiff for the presence of odor narcotics." (Defs.' Mem. at 10.) The plaintiff, however, has alleged facts which demonstrate that the officers considered the alert a "false alert," had already conducted a search of Lynn's locker and a pat-down search of his person, and only arrested and searched Lynn after he remained in the waiting area to speak with the warden. Based on these allegations, the officers did not search, arrest, or subject Lynn to force

"based on" the dog alert, but rather for an invalid reason, such as harassment. Accordingly, under Lynn's allegations, his constitutional rights would have been violated.

The second inquiry is whether it would have been clear to the defendants that their actions violated Lynn's rights. Under Lynn's version of the facts, the officers arrested and searched him without any basis for reasonable suspicion or probable cause. Accordingly, the officers are not entitled to qualified immunity.

A separate order is being entered herewith.

## ORDER

For the reasons stated in the accompanying memorandum, it is, this 8th day of May 2003

ORDERED that

1. Defendants' motion to dismiss the third amended complaint or, in the alternative, for summary judgment is granted in part and denied in part;

2. All claims against Defendants in their official capacity are dismissed;

3. Lynn's claims of temporary imprisonment, invasion of privacy, equal protection, and due process under Count I are dismissed;

4. Counts II is dismissed against Defendant Lockley; and

5. Summary judgment is granted in favor of Defendants on Count IV.